HARRY A. TROWER v. MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, a Corporation, Appellant.—149 S. W. (2d) 792.

Division One, April 18, 1941.

*Carl S. Hoffman* and *Everett Paul Griffin* for appellant.

*Trusty, Pugh, Green & Trusty* and *Chelsea O. Inman* for respondent.

DALTON, C.—This is an action for $65,000 damages for personal injuries. Plaintiff was injured when one of defendant's motor trains collided with the automobile in which he was riding at a crossing on Kansas Highway No. 96, near Riverton, Kansas, October 28, 1934. The law of the State of Kansas was duly pleaded, and the cause submitted (1) upon primary negligence, (a) in failing to have a headlight burning, (b) in failing to give reasonable and timely warning signals, and (c) in failing to keep a reasonable and sufficient lookout for automobiles at the crossing; (2) upon negligence under the last clear chance doctrine of Kansas in failing to stop or slacken speed; and (3) upon wanton injury. The answer was a general denial and a plea of contributory negligence. The jury returned a verdict for defendant. Thereafter, plaintiff's motion for a new trial was sustained on account of an alleged error in defendant's instruction No. 16. Defendant appealed.

Plaintiff and his wife were guests of Russell M. Riggins and wife and were returning from Kansas City, Missouri, to their home in Bartlesville, Oklahoma. They were riding in a new Packard sedan owned and driven by Mr. Riggins. Plaintiff was in the front seat, to the right of Mr. Riggins. The ladies were in the rear seat. The highway was straight and level. It was paved with concrete, 20 feet in width, with a shoulder 5 or 6 feet wide on each side and a ditch about 4 or 5 feet in depth beyond each shoulder. The day had been clear. The pavement was dry. The highway was much used by automobile traffic, and the automobiles customarily traveled at high speeds. Defendant's railroad crossed from east to west or a little southeast to northwest. The track was straight except for a slight curve beginning 600 feet east of the crossing. The crossing was generally level with the highway, but the rails were slightly lower than the level of the pavement, and could not be seen until one was right on the crossing. The pavement stopped at the ends of the ties, about 18 inches from the rails, and the ties were covered with planks and black top or macadam with some gravel.

The highway and railroad were higher than the level of an open field east of the highway and north of the railroad. This field had been in corn, but the corn had been cut and shocked. At the crossing, 34½ feet north of the center of the track and 11 feet west of the slab, was the usual cross-arm railroad crossing sign, 12½ feet in height, with the words "Railroad Crossing—Look Out For The Cars —Safety First." It was an old sign and showed some signs of weathering. The white paint had begun to scar up and was gray. About 530 feet north of the crossing and 6½ feet west of the slab, near the ballustrade of a culvert, was the usual highway railroad crossing sign, a 2 foot metal disk, with a black cross and letters "R. R." on a field of yellow. This sign was mounted on a post 4½ feet in height. South of the railroad, and east and west of the highway, was "a rather heavy growth of trees." When one approached the crossing from the north the crossing sign appeared against the background of the trees southwest of the crossing. "It was not out from those trees, it was not plain." The trees south of the railroad and east of the highway extended for about 150 yards east of the highway. On the railroad right-of-way, just east of the crossing, was a railroad switch and a flag stop known as Military Switch. A drive on the railroad right-of-way led from the highway to the switch.

As the automobile approached the crossing, it was traveling south on the main highway out of Pittsburg, Kansas, at about 50 or 55 miles per hour. It was about 5:25 P. M. The sun had been down a few minutes. It was hazy and early dusk. The lights of the automobile were on dim, not as an aid to driving, but so others could see the automobile. There was nothing about the way the car was traveling to disturb the passengers.

Defendant's motor train, a one car gasoline electric train, was traveling west at about 30 or 35 miles per hour. It had the appearance of a long passenger coach. The engine was located in the front portion, with the baggage compartment next, and the remaining portion was for passengers. This motor car was classified as a locomotive and weighed 77,600 pounds.

About 500 feet north of the crossing and on the east side of the highway was quite a heavy growth of trees which obstructed the view from the highway toward the east. From this clump of trees on south to the crossing there was nothing to obstruct the view from the highway toward the railroad or from the railroad toward the highway.

Plaintiff had not been over the highway before, and, although, he knew that various railroads entered Pittsburg, he had no knowledge of the location of any railroad crossings. At the time the automobile passed the clump of trees mentioned above, plaintiff was seated at a slight angle facing toward the southeast, watching these trees, and he did not notice the highway railroad crossing sign, the railroad crossing sign, the telegraph poles and wires along the railroad track,

nor the place where the railroad crossed the highway. None of the persons in the automobile saw any of the crossing signs or heard any warning signals by bell or whistle, although the window at the driver's seat was down. After the automobile had passed the clump of trees, plaintiff saw a dark object moving against a background of trees beyond. Plaintiff testified: "It was rather difficult to see because the sun was down and there were no lights on the (railroad motor) car. It was early dusk and it blended into this background of trees . . . south of the railroad track, so it was not readily noticeable, and as soon as I saw it, I said, 'Look out, Russell; there's a train.'" The driver was looking straight down the slab and had not noticed the approaching train nor the crossing signs prior to that time. When plaintiff spoke, the automobile was about 200 feet north of the crossing and the railroad motor car was about 250 feet east of the highway. Mr. Riggins immediately put on the brakes, but the car traveled approximately 75 feet before the brakes took hold. The automobile slowed down gradually until it was traveling about 10 miles per hour at the time of the collision. At no time did the train change its speed, or give any warning signals.

According to Mr. Riggins, when plaintiff called to him to look out, he saw "a kind of a blurred looking object, black object," moving to the right on his left. It was then about 200 feet east and the automobile was "200 feet or so" north of the point of collision. The front of the automobile arrived first at the crossing and the train hit the automobile. The automobile traveled about 200 feet after the brakes were put on. Mrs. Riggins and Mrs. Trower thought the motor train was about 200 feet from the crossing when they saw it after plaintiff said, "Look out, Russell." After the collision skid marks, which were not there before, were plainly visible on the concrete for approximately 120 feet north of the crossing.

One of plaintiff's witnesses heard the train whistle near the curve but said it did not whistle between that point and the crossing, or for Military Switch. He said that when the automobile was about 350 to 400 feet north of the crossing the train was about 360 feet east of the crossing; and that the automobile did not slacken speed until it was 125 feet from the crossing. The train hit the left front corner of the automobile, the fender, springs and bumper and threw the automobile around so that it was headed northwest. All the occupants of the automobile were seriously injured. The motor train stopped 300 feet west of the crossing.

There was other evidence that the train did not slacken speed prior to the collision. Although it was after sundown, no headlight was burning on the motor train, as required by the law of Kansas.

Defendant's evidence tended to show that there was a whistling post about a quarter of a mile east of the crossing and that defendant's engineer started blowing the crossing whistle at this post and

turned on the automatic bell ringer. The train was traveling about 30 miles per hour as it approached the crossing. The engineer testified: "Your view to the north is clear for quite a ways back on the highway, and you have a good view for over a quarter of a mile coming on the railroad track up that way. Then as you near the crossing, I have to look to the left, and there was no cars approaching from the north. I looked to the left—the (motor) car was traveling all the time, coming nearer to the crossing, and as I got within 35 or 40 feet of the crossing, and saw no cars to the left, I looks to the north and here comes that car at a high rate of speed, and they were about 100 or 125 feet of the crossing." He immediately put on the emergency brakes, but was unable to stop until after the collision. The engineer further stated that the view to the south was somewhat more obstructed than to the north; that when he was at a point 160 or 170 feet from the crossing he looked to the south; that after looking to the south for a second or two he again looked north, at which time the railroad motor car was about 40 feet east of the crossing, and then for the first time he saw the automobile 100 or 125 feet north of the crossing, and it didn't seem to slow down much. The witness admitted he knew the highway was greatly used by automobiles and that they traveled at all rates of speed. He admitted that the rules of his company required him to keep a close lookout at such crossings.

Other evidence of defendant tended to show that the collision occurred at 5:22 P. M.; that it was then daylight and 20 or 30 minutes before sundown; that the headlights on the automobile were not burning, nor were the lights used on automobiles that came to the scene of the wreck; that persons in the vicinity saw the collision from long distances and saw the motor train cross the crossing ahead of the automobile; that the automobile struck the motor train on the right side 7 or 8 feet back from the front and broke the steps and the casting under the springs; that at the time of the collision the railroad crossing signs were plainly visible from the north for long distances; that the whistle and bell on the train were sounded continuously from the whistling post to the crossing; and that the automobile did not slow down before the collision.

One of defendant's witnesses, a passenger on the train, saw the automobile approaching the crossing and heard a series of blasts of the whistle when the automobile was 125 yards (375 feet) north of the crossing and his attention was "frozen on the automobile" as it approached. Another witness, a passenger, watched the automobile as it approached from a point 400 feet up the highway. He said that, when the automobile was 150 feet north of the crossing and the train was approximately 75 to 100 feet from the crossing, he realized that if the automobile did not stop or the train slow down there would be a collision. Another passenger saw the automobile 500 feet north of the crossing, when the train was 80 feet east of the crossing, and

that the train "nosed up to take the crossing" when the automobile was 60 to 65 feet away. Another witness, who was near the railroad right-of-way, about one-eighth of a mile east of the crossing, heard and saw the automobile when it came from behind the trees 500 feet north of the crossing. He said it was traveling 65 to 80 miles per hour; that before the automobile was within 150 to 160 feet of the crossing he thought there would be a collision, unless the train slowed or the automobile stopped, and he tried to get in a position to see what occurred at the crossing.

Defendant offered evidence of actual tests as to the minimum distances within which the motor train could be stopped, to-wit, at 26 miles per hour, in 329 feet; at 28 miles per hour, in 354 feet; and at 31 miles per hour, in 438 feet. According to plaintiff's evidence the train could have been stopped with safety to the passengers, at a speed of 30 miles per hour, in 120 feet, and when the train was within approximately 100 feet of the crossing, without the brakes being applied, it would have reached the crossing in approximately two seconds; while if the brakes had been applied on the train within 100 feet of the crossing it would have required four seconds to reach the crossing.

Appellant (defendant) assigns error upon the granting of the motion for a new trial and contends that plaintiff did not make a submissible case; and that, defendant's peremptory instruction, requested at the close of all the evidence should have been given.

If, upon the whole evidence considered in a light most favorable to plaintiff, no verdict for plaintiff could be permitted to stand, then it was error to grant plaintiff's motion for a new trial and it is immaterial whether instruction No. 16 was erroneous or not. [Rose v. Thompson, 346 Mo. 395, 141 S. W. (2d) 824, 828; Lindsey v. Vance, 337 Mo. 1111, 88 S. W. (2d) 150, 151.] The question of plaintiff's right to recover upon any theory set forth in his petition was raised by defendant's request for a directed verdict at the close of all the evidence.

In determining whether or not the court committed error in refusing to give defendant's peremptory instruction, we are required to take plaintiff's evidence as true, where it is not entirely unreasonable or opposed to physical laws, and to give plaintiff the benefit of all favorable inferences arising from all the evidence. We must disregard defendant's evidence where it conflicts with the evidence of plaintiff or fails to strengthen plaintiff's case. [Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950, 953 (4-11).]

Furthermore, the court may sustain a demurrer to plaintiff's evidence, or direct a verdict for defendant, only when the facts in evidence and the legitimate reasonable inferences drawn therefrom are so strongly against plaintiff as to leave no room for reasonable minds to differ. [Young v. Wheelock, supra; Cech v. Mallinckrodt Chemical Co., 323 Mo. 601, 20 S. W. (2d) 509, 511.]

Plaintiff is entitled to have the benefit of defendant's evidence, except where the evidence runs contrary to the theory of recovery relied on by plaintiff, or where it contradicts plaintiff's own testimony, or where the testimony sought to be used is based solely on the truth of a fact that plaintiff denies. [Meese v. Thompson, 344 Mo. 777, 129 S. W. (2d) 847, 850; Dilallo v. Lynch, 340 Mo. 82, 101 S. W. (2d) 7, 10; Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600, 603.]

▪ Although appellant contends that plaintiff made no case for the jury on any theory, in its reply brief it states: "It must be borne in mind that the only possible theory upon which the case could have been submitted to the jury was under the last clear chance doctrine of Kansas." If, from all the evidence considered in a light most favorable to plaintiff, a case was made for the jury upon any ground for recovery alleged in the petition, the requested peremptory instruction was properly refused.

▪ Did plaintiff make a case for the jury under the last clear chance doctrine of Kansas? Appellant in its original brief contends that the doctrine is one of discovered peril and that plaintiff is barred by contributory negligence. In the case of Bollinger v. St. Louis-San Francisco Ry. Co., 334 Mo. 720, 728, 67 S. W. (2d) 985, this court said: "We had occasion to examine this matter in the recent case of Caylor v. St. Louis-San Francisco Ry. Co., 332 Mo. 851, 59 S. W. (2d) 661, and held that under the law of Kansas a plaintiff's contributory negligence ceases to be a complete defense only when such plaintiff is in helpless peril, that is, in a condition of peril from which he cannot by the exercise of reasonable care extricate himself. So long as the plaintiff has the power to avert the danger by using reasonable care, it is his duty to do so and his failure to do so is negligence concurrent with and contributory to that of the defendant and bars recovery. The same idea is expressed in saying that the last chance doctrine begins to be applicable only when plaintiff's contributory negligence is at an end. In a railroad crossing case the plaintiff's contributory negligence ceases only when he or she has progressed so near to the railroad track that it is practically impossible to avoid a collision by the means at hand. The plaintiff is then in helpless or inextricable peril, is no longer negligent, and previous negligence in going into such position is wiped out, and if the defendant yet has the ability to avert the collision by due care and the means at hand, and fails to do so, it is liable. This, as we understand it, is the Kansas last chance doctrine. It is not limited, however, to an actual seeing or discovery by defendant of the plaintiff's helpless peril, but includes such peril as defendant could discover by due care and vigilance. . . . We, therefore, think that clearly the Kansas doctrine of last clear chance is based on and limited to cases where the plaintiff is in helpless or inextricable peril, though so placed by his own negligence,

and the defendant discovers or ought to discover him in that condition and yet has the ability by due care and the means at hand to avoid the injury, but fails to do so.'' This statement is supported by the following authorities: Muir v. Fleming et al., 116 Kan. 551, 227 Pac. 536; Atherton v. Railways Co., 107 Kan. 6, 190 Pac. 430; Jamison v. Railroad, 122 Kan. 305, 308, 252 Pac. 472; Dyerson v. Railroad, 74 Kan. 528, 536, 87 Pac. 680, 683; Bazzell v. Railroad, 133 Kan. 483, 300 Pac. 1108, 1110; Leinbach v. Pickwick-Greyhound Lines, 138 Kan. 50, 65, 23 Pac. (2d) 449.

In the Dyerson case, supra (87 Pac. 680, 683), the court said: ''The test is, what wrongful conduct occasioning an injury was in operation at the very moment it occurred or became inevitable? If, just before that climax, only one party had the power to prevent the catastrophe, and he neglected to use it, the legal responsibility is his alone. If, however, each had such power and each neglected to use it, then their negligence was concurrent, and neither can recover against the other.'' See also: Williams v. St. Louis-San Francisco Ry. Co., 122 Kan. 256, 252 Pac. 470, 471; Jamison v. A., T. & S.-F. Ry. Co., supra.

In Gilbert v. Railway Co., 91 Kan. 711, 718, 139 Pac. 380, 383, the court said: ''The plaintiff was engaged in an active disregard of his own safety up to the last moment when he might have been saved, and consequently has no standing to invoke the doctrine of last clear chance.''

Appellant relies upon the Bollinger and Caylor cases, supra, but still insists that under the law of Kansas the last clear chance doctrine is one of ''discovered peril.'' Appellant relies upon a particular statement in the case of Maris v. Lawrence Ry. & Light Co., 98 Kan. 205, 158 Pac. 6, 7. The case in the Leinbach case, supra, (138 Kan. 50, 67), comments upon this particular statement in the Maris case as follows: ''All the opinion in the Maris case professed to do was to tell what was held in the Marple and Coleman cases. The misstatement of what was held did not affect what was actually held, nor change the law in any respect, and the court has never regarded the Maris case as changing the law.'' In the Leinbach case the court said (138 Kan. 50, 62): ''Defendant contends it would be liable only if Thompson (its driver) actually saw plaintiff in a position of peril from which he could not extricate himself in time to prevent the collision. In other words, if Thompson were watching a scrub ball game out in the field east of the highway until too late to avoid crashing into the Dodge, he would be excused because he did not actually see the Dodge sooner. That is not the law of this State. . . . It will be observed defendant is not liable to plaintiff in helpless peril for what defendant should have discovered unless defendant owed to plaintiff the duty to be vigilant. . . . In this instance the collision occurred at a city street crossing used by automobiles . . . and defendant rested under duty of vigilance

to avoid injury to all highway users at that point, including plaintiff.'' The court further quoted from the case of Goodman v. K. C., M. & S. Railroad Co., 137 Kan. 508, 512, 21 Pac. (2d) 322, as to the elements of the last clear chance doctrine, as follows: '' '(1) Plaintiff, by his negligence, placed himself in a position of danger; (2) that his negligence had ceased; (3) that defendant seeing plaintiff in a position of danger, or by the exercise of due care should have seen him in such position, by exercising due care on his part had a clear chance to avoid injuring plaintiff; (4) that defendant failed to exercise such due care, and (5) as a result of such failure plaintiff was injured.' '' The court then said: ''This statement is open to criticism in that in (3) the term to be defined is used in the definition whereby a special slant is given to the definition. 'Clear' chance must still be defined, and a chance is a clear chance if exercise of vigilance would have discovered the helpless peril and avoided the injury. Besides that, to make a scientifically complete and accurate definition, the statement should be expanded. The following is the carefully worked out statement of the American Law Institute.'' The opinion then quotes what is now Sec. 479, p. 1253, of the Restatement of the Law of Torts, containing the provision ''. . . '(b) the defendant . . . (3) would have discovered the plaintiff's situation and thus had reason to realize the plaintiff's helpless peril had he exercised the vigilance which it was his duty to the plaintiff to exercise . . .' ''

In the case of Atherton v. Railway Co., supra (107 Kan. 6, 7), the court said: ''Counsel for the defendant frankly concede that the doctrine of last clear chance as frequently declared in this State applies when the defendant actually finds the plaintiff in a condition of peril, or by the exercise of proper care should so find him, his own negligence at that time having ceased. But it is argued with much force, buttressed with numerous authorities, that no duty arises in such cases until the actual discovery of the perilous condition. However, the rule is so firmly fixed in this State and so thoroughly supported by the great weight of authority that it cannot now be changed.'' We think it is, therefore, apparent that the last clear chance doctrine of Kansas is not limited to ''discovered peril'' under the circumstances of this case.

We think that plaintiff made a case for the jury under the last clear chance doctrine of Kansas and it is unnecessary to determine whether he also made a case on any other theory. When the automobile was approximately 200 feet north of the crossing, the plaintiff discovered the presence of the train and warned the driver. Thereafter, there was nothing that plaintiff could do to extricate himself from the peril. It could not be said that he was thereafter ''engaged in an active disregard of his own safety.'' Appellant suggests that he might have taken other steps for his protection. There

were ditches on each side of the highway. Plaintiff had no knowledge of the drive which turned to the east along the railroad right-of-way and he was acting in an emergency. In any case, after he warned the driver of the presence of the train, it could not be said that he was thereafter guilty, as a matter of law, of any contributory negligence which continued up to the moment of his injury. If he had been guilty of any negligence in permitting the automobile to be operated at an excessive speed or in violation of any statute of Kansas, or in failing to see the crossing signs or the train, such negligence was at an end when plaintiff called upon the driver to stop. Plaintiff was then in helpless peril from which he could not escape. The automobile was then in full view of defendant's engineer and its speed should have been apparent. There was evidence that it was seen by others, its speed noted and the danger appreciated. There was evidence from which the jury could find the speed of the train was 35 miles per hour; that its speed was not slackened before the collision; and that the speed of the automobile was reduced from approximately 50 miles an hour to 10 miles an hour after plaintiff warned the driver and before the collision. The automobile and train collided on the crossing and, according to plaintiff's witnesses, the automobile reached the crossing first. There was much conflicting evidence, even among plaintiff's witnesses, as to the respective distance of the train and of the automobile from the crossing at different intervals. The evidence as to speeds and distances was all based upon mere estimates and all conflicts were for the jury under all of the evidence. Although the automobile, after it passed the clump of trees, was upon a heavily traveled public highway, in plain view of the engineer, and although the engineer was under a duty to look out for such automobile, it is admitted that the engineer did not see the automobile until it was approximately 100 feet from the crossing. It was then 100 feet or more, nearer the crossing than it was when plaintiff had notified the driver of the presence of the train. There was evidence from which the jury could find that the train could have been stopped in 120 feet, including reaction time; and that, by application of the brakes 100 feet from the crossing, the speed of the train could have been slackened and the train delayed two seconds in reaching the crossing. The credibility of the witnesses and the weight and value of their testimony was for the jury. We think there was evidence from which the jury could find that plaintiff by his negligence had placed himself in a position of danger; that his negligence had ceased; that defendant saw plaintiff in a position of helpless peril and danger or by the exercise of ordinary care should have seen him in such position; that it was the engineer's duty to keep a lookout ahead; that by the exercise of ordinary care in applying the brakes the engineer had a last clear chance to avoid injuring plaintiff; that he failed to exercise such due care; and that as a result of such failure the plaintiff was

injured. [Eubank v. Kansas City Terminal Ry. Co., 346 Mo. 436, 142 S. W. (2d) 19, 24 (6); Johnson v. Atchison, T. & S. F. Ry. Co. (Mo. App.), 290 S. W. 462, 464 (1).] An issue of fact being made for the jury on these several issues the request for a directed verdict was properly refused.

Instruction No. 16 mentioned in the order granting a new trial is as follows: "The court instructs the jury that the burden of proof is upon the plaintiff in this case to prove *his case* by a preponderance of evidence, and by the terms burden of proof and preponderance of evidence, as used in these instructions, the Court does not refer to the number of witnesses sworn *on either side,* but means that in point of value and credibility the evidence to sustain the plaintiff's case must outweigh that for the defendant, and *the Court instructs you if you believe* that the evidence is evenly balanced, *or that the evidence of plaintiff does not outweigh the evidence of the defendant, then your verdict must be for the defendant."* (Italics ours.)

Appellant contends the instruction is not erroneous. Respondent contends that it is erroneous because, in placing the burden upon plaintiff to prove "his case" by a preponderance of the evidence, it misled the jury into believing that the burden was upon plaintiff to prove ordinary care on his part. Plaintiff requested no instruction on burden of proof. We do not think the instruction subject to the above criticism. The matter is fully discussed in Bleil v. Kansas City (Mo.), 70 S. W. (2d) 913, 914. [See also, Dietz v. Magill (Mo. App.), 104 S. W. (2d) 707, 710; Manar v. Taetz (Mo. App.), 109 S. W. (2d) 721, 723(2).] Respondent relies upon the following cases: Raymen v. Galvin (Mo.), 229 S. W. 747, 749; Hayes v. Sheffield Ice Co., 282 Mo. 446, 221 S. W. 705, 707; Monroe v. Chicago & A. Railroad Co., 280 Mo. 483, 219 S. W. 68, 69; Brewer v. Silverstein (Mo.), 64 S. W. (2d) 289, 291; Schide v. Gottschick, 329 Mo. 64, 43 S. W. (2d) 777, 779. We have examined these cases and are of the opinion they may be distinguished in view of particular issues and facts.

Respondent further contends that the instruction is erroneous (1) because it expressly directs a verdict for defendant if *"the evidence of plaintiff"* did not outweigh *"the evidence of the defendant;"* (2) because it told the jury to weigh plaintiff's witnesses against defendant's witnesses, referring to the witnesses "on either side;" and (3) because it prevented a consideration by the jury of testimony favorable to plaintiff's case which came from defendant's witnesses.

In the case of Chaar v. McLoon, 304 Mo. 238, 249, 263 S. W. 174, 177, a burden of proof instruction contained the words, ". . . the evidence for plaintiffs must outweigh that for defendant. If, therefore, you are unable to decide whether plaintiffs' evidence preponderates, or if you believe and find from (that?) the evidence for the plaintiffs and evidence for the defendant are equally balanced, then it is your duty to find the issues for the defendant." The court said:

"This instruction is misleading in this case. While a trained lawyer might conclude that the words 'plaintiffs' evidence' meant the evidence favorable to plaintiffs, no matter by whom introduced, yet those words ordinarily are understood by both lawyers and laymen to mean the evidence introduced by plaintiffs. In this case much evidence favorable to appellants' recovery came from respondent's witnesses. That this instruction would strongly tend to exclude this last from consideration by the jury in appellants' behalf in determining the preponderance of the evidence seems evident. An instruction with such a tendency should not have been given."

In the case of Barr v. Mo. Pac. Railroad Co. (Mo.), 37 S. W. (2d) 927, 930, a burden of proof instruction contained the words, ". . . if, . . ., you find that the credible evidence offered on behalf of the plaintiff is equally balanced with the credible evidence offered on behalf of the defendant, and that the evidence in this case does not preponderate either in favor of the plaintiff or in favor of the defendant, then . . ." The court said: "This instruction is bad for two reasons. First, the correct test on the question of the weight of the evidence is, if, under all the testimony, that which is favorable to plaintiff preponderates over the evidence favorable to defendant, then the plaintiff has sustained his case by the greater weight of the testimony. The plaintiff is entitled to the evidence offered by defendant favorable to his case and *vice versa*. Second, plaintiff must prove his cause by a preponderance of the evidence. A plea of contributory negligence is an affirmative defense, and on this question the defendant has the burden of proof. The instruction should be so worded that the jury may be correctly guided."

We think instruction No. 16 is erroneous and subject to the criticism that it directed a verdict for defendant if the evidence *of* plaintiff did not outweigh the evidence *of* the defendant. The instruction may well have prevented the jury from properly considering testimony of the defendant's witnesses that was favorable to plaintiff's case. Appellant contends that there was nothing in "the evidence of the defendant," which was in anywise favorable to plaintiff. We cannot agree. There was much conflict in the evidence and matters favorable to plaintiff appeared in the testimony of many of defendant's witnesses. The court granted plaintiff a new trial on the ground that said instruction was erroneous. Since the instruction is subject to some of the criticism leveled against it, we cannot say that no prejudice resulted to plaintiff from the giving of the instruction. [See, Bunyan v. Citizens' Railway Co., 127 Mo. 12, 22, 29 S. W. 842, 845; Thompson v. St. Joseph Ry., Light, Heat & Power Co., 345 Mo. 31, 45, 131 S. W. (2d) 574, 582; Stafford v. Ryan (Mo.), 276 S. W. 636, 637.]

Respondent contends that six other instructions were also erroneous and prejudicial to plaintiff. In view of the conclusions we have

reached, it is unnecessary to consider these instructions. The order granting a new trial to plaintiff is affirmed and the cause remanded. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.