RALPH MARSHALL, Appellant, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Respondent, No. 42102—234 S. W. (2d) 524.

Court en Banc, November 13, 1950.

Rehearing Denied, December 11, 1950.

*C. A. Calvird, David Trusty* and *Sam Mandell* for appellant; *Popham, Thompson, Popham, Mandell & Trusty* of counsel.

*E. G. Nahler, Thos. E. Deacy, Haysler Poague, Ray L. Shubert, Milligan, Kimberly & Deacy* and *Poague, Poague & Brock* for respondent.

236

[525] DALTON, J.—Action for $25,000 damages for personal injuries and property damage sustained when plaintiff's automobile, which he was operating, collided with one of defendant's trains at a grade crossing on U. S. Highway No. 50-S, near Burrton, Kansas, on May 18, 1946. The cause was submitted to the jury under the last clear chance doctrine of Kansas and a verdict was returned for plaintiff for $5,000. Thereafter the trial court sustained defendant's motion for a new trial and its motion for judgment notwithstanding the verdict, and entered a judgment for defendant in accordance with defendant's prior motion for a directed verdict. Plaintiff appealed to the Kansas City Court of Appeals and that court affirmed the judgment, holding that plaintiff had failed to make a submissible case. 229 S. W. (2d) 724. The cause was transferred here upon the order of this court and we must review the record as though the appeal had properly come to this court in the first instance. Sec. 10, Art. V, Const. of Mo. 1945.

The pleadings, issues and evidence are well covered in the statement of facts set out in the opinion of the Court of Appeals, which statement is adopted by reference and need not be repeated here. Some

of the evidence will be reviewed in the course of this opinion and, where necessary, other facts shown by the record will be stated. [526] Briefly the evidence shows that defendant's railroad extends north and south and U. S. Highway No. 50-S, a paved highway, extends east and west. The highway is straight and level for some distance east of the crossing. The crossing was marked by a state highway crossing marker some 300 feet east of the crossing and by the ordinary cross-arm railroad crossing sign some 99 feet east of the crossing. Thirty feet north of the pavement and beginning at a point 104 feet east of defendant's main line track, a heavy shelter belt of trees extended for some 100 feet east and west, parallel to the highway. There was a switch track on each side of defendant's main line, but defendant's train was moving south on the main line at about 15 miles per hour. Plaintiff's evidence tended to show that no signals by bell or whistle were given, and that the speed of the train was not changed prior to the collision. Plaintiff approached the crossing from the east, driving his automobile west on the north side of the highway at 40-45 miles per hour. The pavement was "damp and slick." It was daylight, about 6:30 p. m., but plaintiff did not see the crossing signs, nor hear any noise or signals of the approaching train and he did not see the train until the front end of the locomotive appeared from behind the shelter belt of trees on his right as the train approached the crossing from the north. Plaintiff testified that when he first saw the train it was about 175 feet north of the crossing and that his automobile was about 175-200 feet east of defendant's main line track. He instantly applied his brakes and tried to stop, but lost control of his automobile and was not able to regain control, however the speed of his automobile was reduced to 15 miles per hour before the collision. Defendant's engine and plaintiff's automobile reached the crossing at approximately the same time and "hit just about nose to nose." The automobile was wrecked and plaintiff and two guests were injured, a third guest was killed.

After reviewing the evidence in some detail the Court of Appeals held that there was no substantial evidence of facts from which the jury could determine whether the plaintiff was in fact "helpless" or "unable" with the means at hand, and by the exercise of reasonable care, to extricate himself from the danger or to avoid the collision, or had, in fact, "lost control"; and that "the plaintiff failed to make a submissible case for lack of proof that his own negligence had ceased and that he was unable 'to avert the collision by due care and the means at hand.'" (229 S. W. (2d) 724, 729).

Error is assigned on the action of the trial court in entering judgment for defendant and in holding that plaintiff failed to make a submissible case under the last clear chance doctrine of Kansas. Appellant insists that the trial court "erred in holding that plaintiff was guilty of contributory negligence, as a matter of law, which con-

tinued up to the time of the collision and which barred any recovery under the last clear chance doctrine of the State of Kansas.'' Appellant further insists that ''plaintiff's evidence showed he was in inescapable peril which was discovered or discoverable by defendant in time for it to have avoided a collision by stopping or slackening the speed of its train, and that it failed to do so.''

On the other hand, respondent insists that ''plaintiff's negligence continued up to the time of the collision and directly concurred in causing same''; that ''it was the plaintiff's duty to look for and see the railroad crossing''; that it was his duty as he approached the crossing ''to have his car under such control that he could stop before reaching the track''; that it was his duty ''to approach the crossing at such speed that he could stop after reaching a point where he could see the approaching train and before coming within the danger zone''; that ''the duty to exercise care was a continuing one''; that ''plaintiff's loss of control of his automobile was negligence in itself''; that plaintiff's failure to regain control was likewise negligence; that the evidence did not disclose why plaintiff lost control or why ''he was not able to regain control in a distance of 200 feet''; that plaintiff was guilty of negligence and of failure to discharge his duties in all the respects mentioned; and that such negligence and [527] failure to discharge his duties in the operation of the automobile ''continued up to the time of the collision and directly concurred in causing same.'' Respondent further says that ''under plaintiff's own evidence his reduction of the speed of his automobile was the proximate cause of the collision and that plaintiff by such conduct was guilty of continuing and concurring negligence.''

The essential elements of the last clear chance doctrine of Kansas are well stated in Goodman v. Kansas City, M. & S. R. Co., 137 Kan. 508, 21 P. (2d) 322, 324, as follows: ''(1) Plaintiff, by his negligence, placed himself in a position of danger; (2) that his negligence has ceased; (3) that defendant, seeing plaintiff in a position of danger, or by the exercise of due care should have seen him in such position, by exercising due care on his part, had a clear chance to avoid injuring plaintiff; (4) that defendant failed to exercise such due care; and (5) as a result of such failure plaintiff was injured.'' Also, see Ross v. Chicago, R. I. & P. R. Co., 165 Kan. 279, 194 P. (2d) 491, 495; Leinbach v. Pickwick-Greyhound Lines, 138 Kan. 50, 63, 23 P. (2d) 449.

On the record presented the evidence clearly shows that plaintiff was guilty of contributory negligence in approaching the crossing at 40-45 miles per hour and in failing to see and heed the crossing signals, which were plainly visible. Coleman v. St. Louis-San Francisco R. Co., 130 Kan. 325, 286 P. 254, 257; Heinen v. Atchison, T. & S. F. R. Co., 125 Kan. 612, 266 P. 35, 37; Gage v. Atchison, T. & S. F. R. Co., 91 Kan. 253, 137 P. 938, 939. The plaintiff, in

predicating his right of recovery solely upon the doctrine of last clear chance, concedes that he was guilty of contributory negligence which would otherwise bar recovery. Ross v. Chicago, R. I. & P. R. Co., supra (194 P. (2d) 491, 495); Jamison v. Atchison, T. & S. F. R. Co., 122 Kan. 305, 308, 252 P. 472, 473; Murphy v. Atchison, T. & S. F. R. Co., 353 Mo. 697, 183 S. W. (2d) 829, 832.

In view of the law of Kansas, which is controlling here, the issues presented are: Did plaintiff's negligence cease prior to the collision? If so, when and where did it cease, and what could defendant have done thereafter to avoid the collision and injury to plaintiff? The burden of proof rested upon plaintiff to establish all of the essential elements of his case, including substantial evidence that his negligence had ceased prior to the collision and that it ceased in sufficient time for the defendant thereafter by the exercise of ordinary care to have avoided the collision and injury. Vail v. Thompson, 360 Mo. 1009, 232 S. W. (2d) 491, 493; Bollinger v. St. Louis-San Francisco R. Co., 334 Mo. 720, 67 S. W. (2d) 985, 991; Murphy v. Atchison, T. & S. F. R. Co., 355 Mo. 643, 197 S. W. (2d) 632, 634; Tarter v. Missouri, K. & T. R. Co., 119 Kan. 365, 239 P. 754, 755.

In the case of Vail v. Thompson, supra (232 S. W. (2d) 491, 493), this court pointed out that "under the Kansas law, the contributory negligence of an injured person ceases to be a complete defense only when such person is in helpless peril; 'that is in a condition of peril from which he cannot by the exercise of reasonable care extricate himself.' * * * Until his position of peril is such that he cannot escape therefrom by his own efforts, his negligence (in not doing what he could to save himself) is considered to be a continuing concurring cause." Also, see Trower v. M. K. & T. R. Co., 347 Mo. 900, 149 S. W. (2d) 792, 796; Caylor v. St. Louis-San Francisco R. Co., 332 Mo. 851, 59 S. W. (2d) 661; Dyerson v. Union Pac., 74 Kan. 528, 87 P. 680; Bazzell v. Atchison, T. & S. F. R. Co., 133 Kan. 483, 300 P. 1108; Buchhein v. Atchison, T. & S. F. R. Co., 147 Kan. 192, 75 P. (2d) 280.

The trial court sustained defendant's motion for a new trial because (1) "plaintiff's own evidence disclosed that plaintiff was guilty of negligence which caused or contributed to cause the collision"; (2) "plaintiff's negligence continued up to the time of the collision"; (3) the evidence failed to establish a submissible last clear chance case under the law of Kansas; and (4) the court erred in giving plaintiff's instruction 1 and erred in overruling defendant's motion for a directed verdict as offered at the close of all the evidence. The motion to enter judgment [528] for defendant was sustained because (1) "the evidence discloses and establishes that plaintiff was guilty of contributory negligence as a matter of law"; (2) plaintiff's own negligence directly caused or contributed to cause the collision; (3) "the evidence established that plaintiff's negligence continued up to

the time of the collision;'' (4) the evidence fails to establish any of the allegations of negligence contained in plaintiff's petition; (5) defendant was not guilty of any act of negligence which caused or contributed to cause the collision; (6) ''the evidence fails to establish that defendant herein in the exercise of ordinary care could have avoided the collision * * * after plaintiff's negligence had ceased;'' and (7) ''the evidence fails to establish a submissible case against defendant under the last clear chance doctrine under the law of Kansas.''

In answering the questions (1) did plaintiff's contributory negligence cease to be effective prior to the collision so as not to be a concurring cause under the law of Kansas; and (2) did it cease a sufficient time prior to the collision ''so as to create a sufficient margin in time thereafter and prior to the collision in which defendant had a fair opportunity, a last clear chance, to prevent the collision,'' we must of course consider the evidence in a light most favorable to the plaintiff and give him the benefit of all favorable inferences. Vail v. Thompson, supra; Trower v. M. K. & T. R. Co., supra.

Considering the first question, we will review plaintiff's own testimony further. Plaintiff testified that the first time he realized he was even approaching a crossing was when he ''saw this train just sliding out behind this dense row of trees''; that he was then opposite this shelter belt, ''somewhere between the east and west edge''; that he was ''somewhere between 175 and 200 feet'' from the main line track when he first saw the train or the front end of the engine appear from behind the row of trees; that the train was ''around 175 feet'' from the crossing; that ''somebody hollered 'My God, a train' and started screaming''; that he was ''paralyzed'' and ''didn't know what had happened''; that he ''grabbed for the brakes immediately and * * * lost control of the car, and * * * never did get control of it again until it was too late''; that he ''just never did recover''; that he never did regain control of the automobile, nor have control of it so he could control what it was doing; that it was swerving from side to side in the road and he was afraid it was going to turn over; that the automobile was out of control from the time he first saw the train and jammed on his brakes; that it was out of control from that point up to the time of the collision; that, if he hadn't lost control of the car, he could have stopped it before it got to the track; that he didn't turn to the left and go south down the side road parallel with the track because he ''was out of control''; that he could not tell how the car hit the train because at the time he was doing everything he could to get control of the car; that when he lost control of the car he wasn't able to make it behave the way he wanted it to; that he couldn't steer it properly and couldn't make it stop like he wanted it to; that he didn't have control to make the car go where and when he wanted it to go; that he didn't stop because he had lost control

of the car; and that the accident occurred because he lost control of the car and never was able to regain control.

The record shows that the witness and the examining attorneys used the terms "control," "lost control," "loss of control" and "regain control" with reference to plaintiff's automobile while plaintiff was on the witness stand. No objection was made to the use of any of these terms at any time or on any ground. In these circumstances the natural probative effect of plaintiff's testimony using these terms was for the consideration of the jury. DeMoulin v. Roetheli, 354 Mo. 425, 189 S. W. (2d) 562, 565; Doyle v. St. Louis Merchant's Bridge Terminal R. Co., 326 Mo. 425, 31 S. W. (2d) 1010, 1012. The terms mentioned are in general use and their meaning would be well understood by members of the jury. Webster's New International Dictionary, Second Edition, gives the following synonyms for the verb control: Restrain, rule, govern, guide, direct, check, subdue.

It is true that plaintiff further testified that he didn't remember whether the brakes [529] grabbed when they were applied, or whether he depressed the clutch, as he was too excited at the time to remember; that he didn't remember whether the car remained in gear up to the time of the collision, or whether he ever took his foot off the brakes or whether he applied the brakes enough to slide the wheels, or whether the car skidded or slid on the pavement; and that he didn't know where the train was when his car was at the west edge of the shelter belt, or the speed of his car at that time; that he didn't know why he was unable to stop before reaching the track, that is, whether it was because of the brakes, the speed, or the damp and slick condition of the road; and that he thought, if he had put his foot on the accelerator while driving on the level concrete road at 40 to 45 miles per hour, the car would have responded and picked up some speed in 200 feet, but that he didn't do it.

If plaintiff was guilty of negligence in the emergency in applying brakes and trying to stop, rather than "stepping on the gas" and trying to beat the train across, we cannot say as a matter of law that such negligence continued up to the time of the collision. See, Hill v. Southern Kansas Stages Lines, 143 Kan. 44, 53 P. (2d) 923, 927. We think that all of the evidence as to plaintiff's inability to remember or know just what happened went only to the weight and value of his testimony as to loss of control and inability to regain control. We think the record shows sufficient and substantial evidence from which the jury could infer and find that plaintiff was in a position of imminent, helpless and inescapable peril from the time he applied his brakes and "lost control" of his automobile; and that from and after that time the jury could infer and find that his negligence in all the respects contended for by respondent had ceased and that he could not

avoid the collision or extricate himself from such peril by the exercise of ordinary care.

■ After plaintiff's contributory negligence had ceased as a concurring contributory cause under the law of Kansas, was plaintiff's imminent and inescapable peril discovered or discoverable by defendant, in the exercise of ordinary care, in time to avoid a collision by stopping or slackening the speed of the train as contended by appellant?

The engine in question was "a steam engine, No. 714, 700-class, coal-burning locomotive, hand fired," and the train was equipped with air brakes. Plaintiff's witnesses were examined on the theory that the engineer and firemen were in the cab of this engine, which defendant's evidence shows was some 43 or 44 feet back from the front end of the engine. While appellant argues "that the fireman could have seen the plaintiff at the very instant when plaintiff saw the engine," plaintiff offered no evidence that the fireman was on the front of the engine or that either the fireman or the engineer on defendant's train could have seen plaintiff's automobile as soon as plaintiff could have seen the locomotive coming out from behind the dense shelter belt of trees.

Plaintiff's expert witnesses (engineers) fixed the stopping distance of the train (operating at 15 miles per hour) "from the time the fireman holler 'big hole it' until the engineer could get it stopped" at 100 to 110 feet or "a little over 100 feet," and at 20 miles per hour at 125 to 130 feet, or "about 125 feet."

As stated, plaintiff testified that he was operating his automobile on the north or right hand side of the pavement when he saw this train sliding out behind this dense row of trees; that the shelter belt of trees was about 100 feet wide and extended 300 or 400 feet to the north; that the trees came to within 30 feet of the pavement; that the shelter belt began 104 feet east of the main line track; and that one could not see through the trees, because they were in leaf and quite thick and quite dense. There was nothing to obstruct the view to the north after one passed the west edge of the shelter belt. He saw the train only twice, once when it came out from behind the trees and later just prior to the collision. The distance of the shelter belt from the pavement and from the main line track was confirmed by many witnesses. Plaintiff said he "was somewhere between 175 and [530] 200 feet" of the crossing when he first saw the train; that the train was a little closer to the crossing than he was; that train was around 175 feet from the crossing; and that he had been to the crossing since the collision and had looked the situation over and had refreshed his mind as to distances. We think that plaintiff's testimony as to the distance of the train and of the automobile from the crossing, when he saw the train, is directly in conflict with the admitted

physical facts and that he could not have seen the train under the facts stated.

Further, plaintiff also offered conflicting evidence on his ability to have seen the train under the facts stated. Plaintiff's witness Bliss testified as follows: "Q. (By Mr. Trusty) When you get back 175 to 180 feet to the east of that crossing there can you see cater-cornered across the end of that shelter belt of trees some distance up the railroad tracks? A. No." The witness further said: "You got to get west of the shelter belt before you can look north * * * You must be 15 feet west of the shelter belt before you can even look north. * * * The first place you can see a train you would be at the edge of the shelter belt looking off in a northeasterly direction." Plaintiff's wife testified that the trees were heavy enough to obstruct her view of the track to the north; and that she first saw the train when "we just passed these trees, and I could look over * * * we weren't passed them, but, you know, when you could see around the corner, or something"; that she thought she saw the train as soon as she could after it got out from behind the trees; that there was a sudden reduction in the speed of the car after she screamed; that she was thrown forward; and that the car skidded and started weaving back and forth from one side of the road to the other during which time it continued to reduce speed.

If plaintiff was traveling at 40-45 miles per hour and slowed to 15 miles per hour before the collision, his average speed was something like 27½ to 30 miles per hour or 41 to 44 feet per second. If plaintiff was 175 to 200 feet from the crossing, when he began to slow down, he would have reached the crossing in some 4 or 5 seconds. On this basis, since the engine and automobile met "nose to nose," and the train had been moving at an undiminished speed of 15 miles per hour or 22 feet per second, the engine could not have been more than 88 to 110 feet north of the crossing, when plaintiff put on his brakes and began to slow down. Further, since we cannot see around a corner or through a dense obstruction, it can be mathematically demonstrated that if the highway and the main line of the railroad crossed at right angles, as all of the testimony shows, and if plaintiff was 175 to 200 feet east of the crossing and there was a dense obstruction on plaintiff's right 30 feet from the edge of the pavement and extending to within 104 feet of the main line of the railroad and if plaintiff was in the driver's seat on the left hand side of his automobile and near the center of the pavement and some 40 feet south of the obstruction (as his testimony tended to show), he would not have been able to see the front end of an approaching train until it was within 83⅓ to 98½ feet of the center of the pavement at the crossing. These distances are less than the stopping distance of the train

after notice to the engineer. If the train was 175 feet from the crossing, plaintiff under the admitted physical facts would not have been able to see the front of the engine until he was within 135 feet of the main line tracks at the crossing. If plaintiff was within 135 feet of the crossing and traveling at the average speed of 27½ to 30 miles per hour (41 to 44 feet per second), and the train was moving at the speed testified to by him, he would have arrived in a little more than 3 seconds, while the train would not have arrived for almost 8 seconds and the collision could not have occurred. If we consider the fact that defendant's witnesses fixed the speed of the train at 15 to 20 miles per hour and that one of defendant's witnesses fixed the distance from the crossing to the trees at 110 feet, the situation for plaintiff is little improved, particularly since there is no evidence that the trainmen were on the front end of the engine and could have seen plaintiff's automobile as soon as plaintiff [531] saw the engine as it appeared from behind the obstruction. In addition, we should also consider reaction time for the fireman to have seen and realized the danger and to have shouted the warning to the engineer.

The only other evidence relied upon is plaintiff's own testimony in connection with plaintiff's exhibit 1. This exhibit was a photograph taken at a point on the main line track, looking southeastwardly. It shows an automobile parked on the highway near the southwest corner of the shelter belt of trees. On plaintiff's cross-examination of one of defendant's witnesses the location of the front of this automobile was fixed at approximately 120 feet from the crossing. As a witness in his own behalf plaintiff pointed out the highway in this picture as "this little line right here." He said that there was "a car setting on the highway"; that "this stuff here" was a part of the shelter belt; and that something else pointed out was the southwest corner of the shelter belt of trees. Concerning something else pointed out by counsel, he said, "that is a high line pole." The pole was not marked or otherwise identified, although some six telephone or light poles appear in the picture and at least two of them have similar cross pieces thereon. Plaintiff further testified that (figuring 3 feet to a step) a switch target appearing in this picture was 175 feet from the crossing; that the camera was about 10 feet from the switch target. Thereafter plaintiff testified as follows: "Q. I want to ask you what distance it is from this high line pole here on up to the west to the railroad crossing? A. The middle track. Q. Yes. A. I stepped that off. It was about 65 or 66 steps. That would make it about 180 feet, somewhere about that." The high line pole in question was not identified in any manner, nor its location otherwise designated. The picture shows what is apparently a high line pole and what is apparently a high telephone pole in the general southeast direction and near the

southwest corner of the shelter belt of trees. Appellant argues that ''the 'high line' pole, just west of the automobile shown in the photograph, is about 180 feet east of the crossing.'' While it is true that on the photograph the pole .appears to the right of the automobile, yet since the pole is beyond the automobile the relative distance to the crossing is not apparent. Further, plaintiff subsequently identified another photograph, defendant's exhibit 3, which was offered and received in evidence with plaintiff's testimony. This exhibit clearly shows that the poles, which in plaintiff's exhibit 1 appear to be high line poles, were in fact located south of the highway. There is no evidence in the record to show how far this high line was located south of the center line of the highway or how far any of the high line poles were distant from this critical southwest corner of the shelter belt. While it appears that the high line pole referred to in argument was sufficiently south of the center line of the highway so that in the photograph the pole appears to the right of both the automobile and the shelter belt of trees, this fact is of no probative value in establishing the distance of this automobile from the crossing. In this situation plaintiff's testimony as to the distance of the high line pole from the crossing was insufficient to show that an automobile on the north side of the highway 180 or more feet east of the crossing, or any particular distance, could have been seen by the trainmen when the train was 180 feet north of the crossing, even assuming that they were on the front end of the engine.

On the evidence presented, we must hold that there is no substantial evidence that plaintiff's imminent and inescapable peril (after the loss of control of his automobile) was discovered or discoverable by defendant in the exercise of ordinary care in time for it to have thereafter avoided the collision by stopping or slackening the speed of the train.

The judgment is affirmed. All concur.