Golden J. FOSTER, Plaintiff-Appellant,

v.

KANSAS CITY SOUTHERN RAILWAY COMPANY, a Corporation, Defendant-Respondent.

No. 45888.

Supreme Court of Missouri, Division No. 1.

Nov. 12, 1957.

Don G. Stubbs, R. S. McKenzie, Stubbs, McKenzie, Williams & Merrick, Kansas City, for appellant.

Richard S. Righter, Robert D. Youle, James F. Walsh, Kansas City, for respondent.

VAN OSDOL, Commissioner.

Plaintiff, Golden J. Foster, instituted this action for the wrongful death of her husband, Emery Robert Foster, who lost his life when the tractor-(semi) trailer he was driving was struck by defendant's train. The cause was submitted to a jury upon negligence of defendant under the last clear chance doctrine of Kansas. The jury returned a verdict for plaintiff awarding $15,000 damages. Thereafter, defendant Kansas City Southern Railway Company moved for judgment for defendant in accordance with its motion for a directed verdict and, in the alternative, for a new trial. The trial court sustained the motion, set aside the verdict and judgment for plaintiff, entered judgment for defendant, and alternatively granted a new trial. Plaintiff has appealed.

The decisive question herein upon appeal is whether or not plaintiff made a submissible case of negligence of defendant under the Kansas last clear chance doctrine. In determining this question we must consider the evidence in the light most favorable to plaintiff. We are required to take plaintiff's evidence as true, where it is not entirely unreasonable or opposed to physical laws, and to give plaintiff the benefit of all reasonable inferences arising from all the evidence. Trower v. Missouri-Kansas-Texas R. Co., 347 Mo. 900, 149 S.W.2d 792.

July 8, 1954, the tractor-trailer driven by plaintiff's decedent was struck by the locomotive of defendant's train at a crossing three and one-half miles south of Crestline in Cherokee County, Kansas. Deceased had been driving the combination motor vehicle southwardly on Kansas State Highway No. 26, a north-south highway with concrete pavement twenty feet wide. At the point of collision defendant's southwest-northeast tracks angle across the highway at grade. The highway and tracks are practically level, as is the surrounding terrain, except that when a train approaches the crossing from the southwest it moves a "little bit" downhill, but the grade levels off ten or fifteen car lengths southwest of the crossing. There are "cross-buck" railroad crossing signs northwest and southeast of the crossing, twenty-five feet from the center line of the pavement. There was evidence tending to show that, due to the foliage of trees along the fence on the west right-of-way line of the highway, the southbound traveler cannot see a train in its approach from the southwest until the traveler reaches a point on the highway 300 feet north of the crossing—from that point, only the locomotive of the northeast-bound train may be sighted; and a southbound vehicle at that point on the highway cannot be seen from defendant's train until the train is at a point 150 feet southwest of the crossing.

The tractor-trailer was forty to forty-seven feet long. The tractor had two wheels in front and dual wheels at the rear; the trailer had dual wheels on each side at the rear, and was loaded with four automobiles. Defendant's train, consisting of a Diesel locomotive of three units, twenty-two freight cars—twelve "loads" and ten "empties"—and a caboose, was moving

northeastwardly. The collision occurred in the afternoon a little before six. It was a clear day, fairly hot, and the surface of the highway was dry.

Plaintiff in endeavoring to make out her case was obliged to rely upon the testimony of the fireman and head brakeman of defendant's train, who, with the engineer, were riding at the front of the front or lead unit of the locomotive. They, and deceased, were the only eyewitnesses. The engineer died prior to trial, and his testimony had not been preserved by deposition.

The fireman testified that he first saw the tractor-trailer when it was 300 feet north of the crossing. It was moving at fifty miles per hour. The locomotive of defendant's train was then 100 to 150 feet from the crossing. The train was moving twenty-three miles per hour. The tractor-trailer started to slow down. "He (deceased) was slowing down. * * * Yes, I would say rapidly." When the tractor-trailer "was back 200 feet from that crossing," the locomotive was "probably 75 foot, I would say." When the tractor-trailer was 75 to 100 feet from the crossing, the locomotive was forty to fifty feet from the crossing. At that time, the witness realized there was going to be a collision, and he "left the fireman's seat * * * and fell to a safety position on the floor" of the cab. He heard the application of the brakes in emergency immediately before the impact.

The head brakeman testified the train had been moving twenty to twenty-three miles per hour; he saw the tractor-trailer when it was 300 feet "back," north of the crossing. A collision first became apparent to him when the locomotive was "approximately 25 feet from the crossing." The tractor-trailer was at that time "maybe 30 or 35 feet from the crossing. * * * Well, he was slowing the truck down and I don't know what speed—I would say he was going right then maybe 20 miles an hour, or approximately 20 miles an hour." When

the locomotive was approximately twenty feet from the west edge of the pavement, the witness could see "that the truck driver wasn't going to get stopped." He, the witness, "jumped down" on the floor; he heard the application of brakes "in emergency" when the train was approximately twenty feet back from the crossing. The bell of the Diesel had been ringing, the headlight burning, and the whistle blowing as the train approached the crossing.

The front of the lead unit of the locomotive struck the tractor-trailer on the right side "approximately where the trailer hooks onto the tractor." The tractor came to rest against the "cross-buck" warning sign southeast of the crossing in a position "covering a portion of the east part" of the pavement. The trailer remained on the north side of the crossing in a position "covering the west half" of the pavement. Gasoline spilling from the crumpled gasoline tank on the right side of the tractor ignited, and plaintiff's husband perished in the collision, or in the ensuing fire.

In approaching the crossing the tractor-trailer had made "skid marks" which commenced 200 feet north of the crossing on the right (west) side of the pavement. The skid marks were continuous down to the rear of the trailer, and, as the marks neared the crossing, they curved somewhat to the eastward so that the right (west) skid mark was at or "a little" east of the center line of the pavement. There was testimony that the trailer tires "were in a skid." It is normal procedure in stopping a tractor-trailer to apply the trailer brakes "and gear the tractor down to keep it from jackknifing."

When the train was brought to a stop, the front of the locomotive was 563 feet northeast of the center of the crossing. The two lead units of the locomotive had been derailed.

There was evidence introduced tending to show that, assuming the train was moving at a speed of "22 (sic) to 23 miles an hour" in approaching the crossing, the

speed of the train in emergency application of brakes could have been reduced two miles per hour within fifty feet; within the next fifty feet the speed could have been further reduced four or five miles per hour; and within the next fifty feet the train could have been further slowed down five or a little better than five miles per hour. The witness summarized by saying the speed of the train could have been slowed down "about 11 miles an hour in 150 feet in emergency application."

■ The elements essential to applicability of the last clear chance doctrine were stated by the Supreme Court of Kansas in Goodman v. Kansas City, M. & S. R. Co., 137 Kan. 508, 21 P.2d 322, 324, as follows, "(1) Plaintiff, by his negligence, placed himself in a position of danger; (2) that his negligence has ceased; (3) that defendant, seeing plaintiff in a position of danger, or by the exercise of due care should have seen him in such position, by exercising due care on his part, had a clear chance to avoid injuring plaintiff; (4) that defendant failed to exercise such due care; and (5) as a result of such failure plaintiff was injured." See also, Ross v. Chicago, R. I. & P. Ry. Co., 165 Kan. 279, 194 P.2d 491; Leinbach v. Pickwick-Greyhound Lines, 138 Kan. 50, 23 P.2d 449, 92 A.L.R. 1; Trower v. Missouri-Kansas-Texas R. Co., supra, 347 Mo. 900, 149 S.W.2d 792; Marshall v. St. Louis-San Francisco Ry. Co., Mo.Sup., 234 S.W.2d 524. In the Leinbach case the statement of the doctrine quoted from the Goodman case was explained and expanded, and reference was made to the "carefully worked out statement" of the American Law Institute. Restatement of the Law of Torts, § 479. And other principles of law are pertinent in considering the ultimate issue of liability in a last clear chance case.

In Ross v. Chicago, R. I. & P. Ry. Co., supra. [165 Kan. 279, 194 P.2d 497], it was observed that a plaintiff who invokes the last clear chance doctrine has the burden of bringing his cause within the doctrine;

and, in the further discussion of principles of law relevant to the ultimate issue in such a case, that court approvingly quoted an excerpt from 44 Am.Jur., Railroads, § 495, p. 733, at pages 734–735, as follows, "'But while the relative rights and obligations of a railroad company and travelers on the highway are reciprocal, it is the privilege of the railroad company that its trains shall have the right of way, and that all persons on the highway shall yield precedence to the trains. From the character and momentum of a railroad train, and the requirements of public travel by means thereof, it cannot be expected that it shall stop and give precedence to an approaching traveler to make the crossing first; the traveler must yield the use of the railroad track to an approaching train, and the conduct of the train crew may be lawfully predicated upon the expectation that travelers will observe their duty in this regard.'"

■ A plaintiff, who predicates his right of recovery solely upon the doctrine of last clear chance, concedes that he was guilty of contributory negligence. Ross v. Chicago, R. I. & P. Ry. Co., supra. And his contributory negligence ceases to be a complete defense only when he is in helpless peril, that is, in a condition of peril from which he cannot extricate himself. So long as plaintiff has the power to avert the danger by using reasonable care, it is his duty to do so, and his failure to do so is negligence concurrent with and contributory to that of defendant and bars recovery. The same idea is expressed in saying that the last chance doctrine begins to be applicable only when plaintiff's contributory negligence is at an end. In a railroad crossing case, the plaintiff's contributory negligence ceases only when he has progressed so near to the railroad track that it is practically impossible to avoid a collision by the means at hand. The plaintiff is then in helpless or inextricable peril, is no longer negligent, and previous negligence in going into such position is wiped out, and if defendant yet has the

ability to avert the collision by due care and the means at hand, and fails to do so, it is liable. Bollinger v. St. Louis-San Francisco R. Co., 334 Mo. 720, 67 S.W.2d 985; Trower v. Missouri-Kansas-Texas R. Co., supra.

■ Plaintiff-appellant urges that contributory negligence of plaintiff's decedent ceased when the tractor-trailer was at a point 300 feet north of the crossing at which point the vehicle was observed to be slackening speed; or that, in any event, contributory negligence ceased at a point 200 feet north of the crossing at which point deceased applied the brakes of the trailer with such pressure that tires of the trailer delineated skid marks on the pavement. Having urged that contributory negligence ceased when the tractor-trailer was 200 feet from the crossing and that deceased was then in inextricable peril, plaintiff-appellant relies on the testimony that the speed of the train could have been retarded by the application of its brakes in emergency to the extent of two miles per hour within fifty feet, and additionally four or five miles an hour in the next fifty feet. It is assumed by plaintiff-appellant that the train in moving 150 feet to the crossing was moving at twenty miles per hour; that, consequently, the average speed of the tractor-trailer in moving the 300 feet to the crossing was forty miles per hour; and that, when the tractor-trailer was 200 feet from the crossing, the train must have been 100 feet from the crossing so that the tractor-trailer and the train, respectively, must have moved the 200 feet and the 100 feet to the point of collision in 3.4 seconds. Plaintiff-appellant urges the testimony of plaintiff's expert indicating the possible deceleration of the speed of the train by an emergency application of brakes so that the train (if braked "in emergency" during the last 100 feet of its movement to the point of collision) would have actually taken 4.1 seconds to move the stated distance of 100 feet to the point of collision. Plaintiff-appellant continues by saying, "In 4.1 seconds at its average speed (40 miles per hour), the deceased's truck would have traveled a fraction under 240 feet from the point 200 feet from the crossing." Plaintiff-appellant then draws the conclusion that, inasmuch as the total length "of the tractor-trailer unit could have been found to be as little as 40 feet, and the tractor itself got almost completely across the tracks as it was, it is apparentt that the jury could have found from the foregoing evidence and computations that, had the train crew applied the brakes as they could have, the train would have slowed sufficiently for the whole of deceased's tractor-trailer unit to get across the crossing before the locomotive reached the crossing, thereby avoiding any collision whatsoever." Here we point out that the conclusion drawn by plaintiff-appellant presupposes the tractor-trailer in its immediate approach and progress onto and partially over defendant's tracks was moving at a speed of forty miles per hour. Additional argument by plaintiff-appellant is based on like assumptions.

On the issue as to the time when deceased was in a position of danger in the sense that he no longer had the power, in the exercise of reasonable care, to avoid passing into the pathway of the train, the jury was afforded no evidence of the condition of the brakes of the motor vehicle and no evidence of the distance within which the vehicle could have been stopped, loaded as it was and operated by deceased in approaching the railroad crossing. The evidence on the issue consisted merely of the testimony of marks delineated by the tires on the surface of the pavement, which marks were called "skid marks" by the witnesses with no particularity of description by which it could have been inferred whether the brakes were applied to the full extent of their braking power, although it seems it reasonably could be found that deceased was employing the correct procedure in first applying the brakes to the trailer. Nor was there any other evidence introduced relating to the management or operation of such a combination motor vehicle in the situation confronting deceased as the

vehicle approached the crossing. But if it were assumed a jury reasonably could find that (at a point 200 feet north of the crossing where the skid marks began) plaintiff's decedent then or at some point or time thereafter was no longer able, in the exercise of reasonable care, to manage the tractor-trailer so as to avoid passing into the pathway of the train, yet there was no substantial evidence introduced supporting the conclusion that defendant's train crew then had time with the means at hand to avert the collision. (There was no evidence tending to show the train could have been stopped short of or to the southwestward of the point of collision, and plaintiff-appellant does not contend negligence of defendant specifically in failing to stop the train after defendant's train crew saw or should have seen deceased was in a position of danger.)

As we have stated, plaintiff-appellant urges defendant was negligent in failing to slacken the speed of the train. Here again, and assuming as true that the speed of the train could have been retarded to the extent as stated by plaintiff's witness, it would be purely conjectural and without substantial evidentiary basis to conclude the train crew could have avoided colliding with the tractor-trailer by the application of brakes in emergency at the time the train and the tractor-trailer, respectively, were 100 and 200 feet from the crossing. This, because of the evidence tending to show the retarded but undetermined speed of the tractor-trailer in its immediate approach to the crossing. We have noted the testimony that the tractor-trailer, when it was thirty or thirty-five feet from the crossing, was moving but twenty miles an hour, "approximately." Apparently, the tractor-trailer, due to the application of brakes had been retarded in its speed to approximately twenty miles per hour when it was yet thirty to thirty-five feet from the crossing. The circumstance of the skid marks and the testimony of the witnesses indicated the tractor-trailer was "slowing down" rapidly. Inasmuch as the skid marks continued to the rear of the trailer where it had come to rest after the collision, the speed of the combination vehicle (in moving the thirty to thirty-five feet to the crossing and partially onto the tracks where it was struck by the locomotive) was further retarded so that it could not be reasonably found that the motor vehicle when passing onto plaintiff's tracks was moving at any particular speed, or that it was moving at any appreciable speed at all.

Re-examining plaintiff-appellant's argument summarized supra, we again notice it is urged it could be mathematically demonstrated that, if defendant's crew by the application of brakes in emergency had slackened the speed of the train so that it would have taken the train 4.1 seconds to travel the 100 feet to the crossing and point of collision, the tractor-trailer could have passed entirely across the tracks and the collision averted. We are constrained to the belief that such argument is based on the unsubstantial premise or assumption that the tractor-trailer in immediately approaching and going onto the tracks was moving at its supposed "average speed" of forty miles per hour.

We have the opinion there was no substantial evidence introduced supporting an essential element of the last clear chance doctrine, that is, that defendant in the exercise of due care had a clear chance to avoid injuring plaintiff. As said by the Supreme Court of Kansas in Ross v. Chicago, R. I. & P. Ry. Co., supra [165 Kan. 279, 194 P.2d 497], "it is obvious that the doctrine may not be invoked where no substantial evidence has been adduced that time remained in which the accident could, with reasonable care, have been avoided after the plaintiff's peril, in which he has entrapped himself by his own negligence, has been discovered or should have been discovered by the defendant."

·The judgment for defendant should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.