WM. T. ALFORD, ADMR. OF WM. LINDSEY, RESPONDENT, v. WABASH RAILWAY COMPANY, APPELLANT.—73 S. W. (2d) 277.

Kansas City Court of Appeals. May 21, 1934.

*Garland Wilson* and *Kelly, Buchholz & O'Donnell* for respondent.

*S. J. Jones, F. W. Ashby, R. B. Elster, Andrew Field* and *Homer Hall* for appellant.

SHAIN, P. J.—This cause was up for hearing in this court, at the March term, 1933. The style of the case, at that time, was William Lindsey, Respondent, v. Wabash Railway Company, Appellant. The case was argued, submitted and an opinion by BLAND, J., was handed down and a motion for rehearing was duly filed May 11, 1933. The motion for rehearing was overruled and the opinion modified on June 12, 1933.

Shortly, thereafter, the death of William Lindsey, respondent, was suggested as having occurred at a date prior to our judgment, to-wit: As of October 21, 1933. Due notice was also given of the appointment of William T. Alford as administrator.

On July 12, 1933, an order was made by this court setting aside the judgment and the cause was revived in the name of the administrator, usual summons ordered and cause continued to the October term, 1934. Supplemental briefs were duly filed and cause was reargued and submitted at the April call, 1934, of this court and the case assigned to HOPKINS B. SHAIN, P. J.

After a careful review of the record and briefs filed herein, we find no reason to change our conclusions as expressed in the modified opinion heretofore filed herein.

In the supplemental brief, filed by the appellant, complaint is made to the effect that plaintiff had read a letter to a Mr. Tead. A study of the record discloses that the question might have been misunderstood by witness. A further objection is made to a statement that plaintiff had signed a release at two places. The point seems well taken and with the consent of Judge BLAND these matters have been changed in his opinion to conform to the suggestion made by appellant.

The opinion of Judge BLAND, of June 12, 1932, as modified and corrected, so clearly conforms to my conclusions and the opinion so clearly and ably presents the issues and determines the facts that I adopt the opinion of BLAND, J., aforesaid, as my opinion. The opinion is as follows:

"This is an action for damages for personal injuries, brought under the Federal Employers' Liability Act. Plaintiff recovered a verdict and judgment in the sum of $4,000 and defendant has appealed.

"Plaintiff, a resident of Alexander, Illinois, brought this suit in the Circuit Court of Daviess County, in this State, to recover damages for personal injuries received by him on November 29, 1929, at a crossing of a public highway with defendant's railroad, about two miles east of Alexander. The injuries were caused by a collision between an automobile being operated to the south over the crossing

and a west-bound motor handcar, on which plaintiff, a section laborer employed by defendant, was riding to Alexander, after his day's work, with his section crew. Plaintiff sued under the Federal Employers' Liability Act.

"The motor handcar upon which plaintiff was riding was about six feet long and four feet eight inches wide. It had constructed therein a box about three feet wide and extending eighteen inches above the floor. This box ran lengthwise of the car and was located in its middle. There were four men in the section crew. Two of them were seated upon the handcar with their faces toward the east and two towards the west. The foreman was seated in front facing toward the west. Plaintiff was seated to the rear and facing toward the east. It was the duty of plaintiff and the other men facing east to keep a lookout toward the east and the foreman and the other men facing west to look to the west for possible approaching trains. It was cold and the carburetor of the motor of the handcar was not working well. McMann, a member of the crew, was seated to the south of the center of the motor handcar tending to the carburetor. The foreman was seated to McMann's right and on the north side of the car, tending to the brakes. As they approached the crossing going at a slow rate of speed, the foreman, instead of looking out ahead, as was his duty, was watching McMann working with the carburetor. When the motor handcar reached the crossing it struck an automobile, pushing the same across the road and derailing the motor car, injuring plaintiff. The curtains of the automobile were up and the operator thereof did not see the handcar prior to the collision. Plaintiff's injuries consisted mainly of a fracture of the bones in both feet above the ankle, which healed in due time, but he now suffers a limitation in the use of his feet. He also received an injury to his spine.

"Plaintiff, at all times, was a resident of the State of Illinois, while it appears that defendant is a corporation of the State of Indiana. After this suit was filed defendant procured an injunction in the Circuit Court of Morgan County, Illinois, restraining plaintiff from prosecuting this suit on the ground that plaintiff was a citizen of that State and that the defense that defendant would make to the suit pending in this State would require the presence of a large number of witnesses, who lived in the State of Illinois where the accident occurred, and that upon this, and similar grounds, the trial in this State would constitute an unreasonable and wrongful interference with, and burden upon, interstate commerce. However, defendant did not procure this injunction until after it had filed its answer in this case and after the injunction was procured it filed an application for a change of venue, resulting in the change of the venue of the case from Daviess County to Caldwell. Defend-

ant, without success, sought to have this action abated in the court below on account of this injunction.

"After the instant case was appealed to this court the temporary injunction was made permanent and that case was appealed. The Court of Appeals of the State of Illinois reversed the decree of injunction obtained by defendant in the Circuit Court of Morgan County in that State, on the ground that the petition for the injunction stated no cause of action.

"Defendant's first point is that the court below erred in refusing to abate this suit on account of the injunction aforesaid. There is no question but that the Circuit Court of Morgan County had jurisdiction to issue an injunction in a case of this kind (State ex rel. v. Nortoni, 55 S. W. (2d) 272) but the decisions are in conflict as to whether the court wherein the suit is pending; the prosecution of which is sought to be enjoined, will stay the proceedings or abate the suit by reason of such an injunction. If it does so, it is not because the Federal Constitution requires it so to act but, solely, upon the ground of comity. [Kapner v. Cleveland C. C. & St. L. R. R. Co., 322 Mo. 299, 310; Fisher v. Ins. Co., 112 Miss. 30; State ex rel. v. Dist. Court of Hennepin Co., 140 Minn. 494.]

"As before stated, prior to the application to the Circuit Court of Morgan County for the injunction, defendant filed its answer to this cause in the Circuit Court of Daviess County and so this suit was in process of determination in the latter court when defendant applied to the Circuit Court of Morgan County, Illinois, for the injunction. It is not claimed that the Circuit Court of Daviess County may not properly proceed in a case of this kind under the Federal Employers' Liability Act, where there has been no injunction. The right of the Circuit Court of Daviess County to proceed having attached before the injunction, we know of no rule of comity that would require the court below to discontinue the proceedings in this case. [State ex rel. v. Nortoni, supra; 15 C. J., p. 1183.]

"Aside from this, even after the injunction was obtained, defendant itself, proceeded in the Circuit Court of Daviess County by taking a change of venue. Defendant seems to think that the court below should have desisted because plaintiff had been enjoined from prosecuting the cause but defendant, at the same time, could consistently proceed in it. In other words, the litigation could proceed, but only at the behest of the defendant. Under these circumstances, the Circuit Court of Caldwell County could have concluded that defendant had abandoned its injunction proceedings.

"We have examined the cases of State ex rel. v. Nortoni, supra, and State ex parte Crandall v. Habbe, 53 Fed. (2d) 969, and like cases cited by defendant, and find them not in point. Those cases merely deal with the question of jurisdiction of a state court to enjoin a litigant from prosecuting in a foreign state, a suit under the Federal

Employers' Liability Act. We are not basing our holding or opinion upon the theory that the Circuit Court of Morgan County, Illinois, had no right to issue the injunction, but upon the ground that, conceding that that court had jurisdiction to issue it, the Circuit Court of Caldwell County was not required to stay the proceedings in this cause on the ground of comity, under all of the facts and circumstances.

"The evidence shows that plaintiff, for the sum of $264, released his cause of action against the defendant. This release is pleaded in the amended answer. In his reply plaintiff seeks to avoid the release by setting up fraud in its procurement, alleging that defendant represented to plaintiff that said sum was paid as wages and not in release and satisfaction of his claim for damages.

"It is the contention of the defendant that the court should have sustained its demurrer to the evidence, for, as a matter of law, there was no fraud in the procurement of the release. The facts, in this connection, show that plaintiff, after the collision spent several weeks in a hospital, located in Decatur, Illinois, and operated by the employees' association of the defendant railway company, and that he was there treated by Dr. Karol, in charge of the hospital. In the early part of March, 1930, Dr. Karol discharged plaintiff as a patient and told him that he could return to work, which plaintiff did on March 17th, and continued to work for defendant at his old job until April 29, 1930. Dr. Karol told him to see defendant's claim agent, Tead, in Decatur. Plaintiff went to Tead's office on March 13, 1930, having in his possession a letter that he had written to Tead, showing that he had lost in wages the sum of $264.48.

"Plaintiff testified that he gave the letter to the latter, who read it; that he asked Tead, 'what he was going to allow me for my injuries and Mr. Tead said he would give me my time but have to see to that later on . . . about my injuries;' that Tead had him sign a paper, which he told plaintiff 'was a statement for my time;' that the witness did not read the paper he signed because he did not have his glasses with him; that he thought he was signing a statement as to the amount of the wages he had lost; that Tead told him that the witness would receive his money in about thirty (30) days; that no payment of money was made to him at the time he talked to Tead. The paper that he signed reads as follows:

" 'Wabash Railway Company, Decatur, Illinois, station, March 15, 1930. I hereby agree to accept the sum of $264.00 in full settlement of my claim for personal injuries received by me while employed as a section laborer near Alexander, Illinois, on November 29, 1930, Springfield Division, of the Wabash Railway Company; said amount to be paid without unnecessary delay. Signed: Wm. Lindsey, post office, Alexander, Illinois, Correct, A. P. Tead, Voucher to me.'

"Plaintiff further testified that that was the only time he saw or talked to Tead; that on April 5, 1930, he was engaged in cleaning defendant's station at Alexander, when the station agent, Proffitt, told him that his 'money was there.' 'He said I would have to sign a receipt or something for my time and I didn't have my glasses there and I couldn't read it, you know, and he didn't for me and I just signed it for my time.' The witness further testified that he could not read without his glasses and did not read the instrument that he signed, which afterwards turned out to be a release.

"The release is signed by A. M. Moates and J. J. Proffitt as witnesses. Moates was plaintiff's section foreman at the time. Plaintiff testified that he did not remember whether Moates was there when the witness signed the release. The release had stamped upon it: 'This voucher when properly receipted becomes a sight draft on local treasurer' of the defendant. About two hours after he received this paper plaintiff took it to his bank, endorsed it and deposited it to his credit in the bank. The assistant cashier of the bank was a personal friend of his but when plaintiff made the deposit he said nothing to him or anyone else about the paper he signed.

"A photostatic copy of the release appears in the record. At its top in large capital letters appears the words: 'RELEASE OF ALL CLAIMS.' Plaintiff testified that he had never before seen a paper like this one; that the checks he had received were about eight and one-fourth by three and one-fourth inches in size and were on bank paper. The release was shown to him and he testified that it was on yellow paper and was eleven inches long and eight and one-half inches in width. (The photostatic copy of the release shown in the record is eight by fifteen and three-fourths inches.) Plaintiff admitted that he signed the release 'William Lindsey,' and testified that, in signing it, he could see his name but could not see well enough to read it 'after I wrote it.'

"An examination of the release shows that he signed the release on the line provided therefor; that the signature is as near on the line as one would expect to find it if signed by a man of good eyesight. The handwriting is clear and the letters are well formed. The same can be said of his signature on the paper which plaintiff signed in Tead's office. In the signature on that paper he abbreviated his first name 'Wm.,' placing two small lines immediately under the letter 'm.'

"Tead testifying for the defendant, stated that he had not met plaintiff before he came to the witness' office on March 13, 1930, and had not written him or attempted to see him or get in touch with him; that when plaintiff came to his office he made the statement that he had come to make an adjustment of his claim for personal injuries, which he had received on November 29th; that he had figured out that he had lost wages amounting to $264.48; that

108

the witness told plaintiff that neither he nor the defendant thought that it was liable and asked him what he thought the company should do; that plaintiff stated he would like for it to pay him the sum of $264.48 for his injuries; that the witness said this was not an exorbitant sum and that he would take it up with the St. Louis office and recommend that the amount be paid; that it would be necessary for plaintiff to sign an agreement 'making settlement on that basis for that sum for his personal injuries,' which he agreed to do; that 'I drew up the agreement and he signed it. I read it to him so that he would understand what he was doing;' that nothing further was said except that he told plaintiff that it would take two or three weeks for the voucher to come from St. Louis; that as soon as the witness received it he would send it to Alexander. He denied that he stated to plaintiff that the question of settlement for plaintiff's personal injuries would be taken up at a later time. He further testified that he did not see plaintiff after the latter left his office.

"Proffitt testified that plaintiff did not read the release but that the witness read it to him and explained to him that he was releasing the company from all liability on account of the accident and that he and Moates signed the release as witnesses. Moates testified that Proffitt read the release over to plaintiff before the latter signed it.

"The law is well settled that one who is dealing at arm's length with another cannot rely upon what the latter may say to him regarding the contents of a proposed agreement but he must read the agreement for himself if he has the ability to do so and if he does not have such ability he must have it read to him by some one else, if available, upon whom he has the right to rely. [Hannah v. Butts, 51 S. W. (2d) 4; Brennecke v. Ganahl Lbr. Co., 44 S. W. (2d) 627, 631.]

"The facts surrounding the signing of the release in question are very much like those in the case of Brennecke v. Lbr. Co., supra, where the Supreme Court upheld the release. In that case plaintiff's excuse for not reading the release was that his glasses were 'in the shop in a locker' close by. Plaintiff did not ask any one to read the papers to him. In that case plaintiff's glasses were nearby. While, in the case at bar there is no testimony as to where were plaintiff's glasses but the release was executed in a small town where plaintiff lived. In the other case plaintiff also had a stepson, who was working in the same plant where the release was signed, whom plaintiff could have called to read the paper to him. In that case the release and draft were retained for four days, whereas, in the case at bar only about two hours elapsed before plaintiff deposited the draft in the bank. While, in the case at bar, there is no evidence that plaintiff's glasses were near at hand or that he had a relative close by who could have read the release to him, the facts do show that he had a personal friend in the bank where he

deposited the release containing the 'sight draft,' whom he could have called on to read the paper to him before he deposited it. In fact, he could have had anyone else in the bank, or any of the members of his family or friends in the town of Alexander, to read the paper to him. This release was of a different character of paper than he had ever seen or signed before and this should have put him on guard, at least to the extent of having some one, upon whom he could rely, read the paper to him.

"The physical facts surrounding the execution of these papers, including the one plaintiff signed in the office of Tead, show beyond any question that plaintiff knew that he was not signing papers for wages, if he looked at the papers at all. He could see well enough to dot his i's and to write upon the printed line, yet he could not see in large printed letters the words: 'Release Of All Claims,' at the head of the paper that he signed on April 5th, which as before stated, was a character of paper that he had never signed before and on different paper than any of his pay checks had ever been written upon. Plaintiff was in full possession of his faculties and was not illiterate when he signed these papers. We think that under the Brennecke case, supra, and the cases of Higgins v. Am. Car. Co., 324 Mo. 189; Ensler v. Mo. Pac. R. R. Co., 324 Mo. 330; Dyrssen v. Union E. L. & P. Co., 317 Mo. 221, and Allgood v. Tarkio E. & Water Co., 6 S. W. (2d) 51, plaintiff is in no position to claim that he was defrauded and that the release stands as a bar to his recovery in this case.

"In support of his contention plaintiff cites the case of McMillen v. Isreal, 30 S. W. (2d) 626, decided by this court. Also the case of State ex rel. Brown v. Trimble, 23 S. W. (2d) 162, and similar cases decided by the Supreme Court. In the McMillen case this court applied the rule laid down by the Supreme Court in the Brown case, to-wit: That where false representations or fraudulent concealment on the part of the defendant operates to deter plaintiff from reading or having read the papers to which he affixes his signature, plaintiff's negligence in signing the paper without first acquainting himself with its contents, is excused. The same rule was discussed in the Brennecke case, but it was there decided that the rule had no application to the facts in that case. Whether the facts in the Brown and the McMillen cases are so near like those in the Brennecke case as to justify a holding that the latter case, in effect, overrules the two former cases, although not expressly so doing, we need not say, as the rule is that we must follow the latest decision of the Supreme Court. So, therefore, we follow the Brennecke case. We might say, however, that the facts in the McMillen case are not all similar to those in the case at bar.

"However, it is claimed by the plaintiff that the suing out of the injunction operated as a release of all errors in this case and that

defendant is not now in a position to insist upon any errors committed, by the trial court in the trial of this cause, citing in support of this contention, Section 1506, Revised Statutes 1929.

"Section 1501, Revised Statutes 1929, provides as follows:

" 'Proceedings on an injunction to stay a suit or judgment shall be had in the county where the judgment was rendered or the suit is pending, and the summons may be directed and served as summons in ordinary cases.'

"Section 1505, Revised Statutes 1929, provides as follows:

" 'No injunction shall be granted to stay any judgment or proceeding, except so much of the recovery or cause of action as the plaintiff shall show himself equitably entitled to be relieved against, and so much as will cover costs.'

"Section 1506, Revised Statutes 1929, provides as follows:

" 'Every injunction shall operate as a release of all errors in the proceedings that are prayed to be enjoined.'

"These statutes are very similar to those of the State of Illinois, also cited by plaintiff. [See Chapter 69, Cahill's Revised Statutes 1925, sections 4 and 5.]

"It is difficult to see how our statute can be made to apply to an injunction of this kind, under any circumstances but, in any event, it could not have had the effect that plaintiff claims for it. Section 1506, Revised Statutes 1929, has reference to injunctions to stay judgments or proceedings thereon. The theory of the statute is that a party, having made application to a court of equity for an injunction to stay a judgment or proceeding thereon, has delayed his adversary in obtaining the fruits of his judgment at law and, having voluntarily elected to rest his cause upon the principles of equity, he will not afterwards be allowed to take advantage of the errors that may have occurred in the proceedings at law, in any other way than that which he has chosen to adopt. [See McConnel v. Ayers, 4 Ill. 210.]

"We have examined the cases of Sansone v. Am. M. Ins. Ass'n, 20 S. W. (2d) 293; McKenney v. Clark, 84 Mo. App. 624, and like cases cited by plaintiff, and find them not in point, as they do not involve injunctions to stay proceedings before judgment and, unlike the case at bar, the injunction had some potency.

"The judgment is reversed. All concur.

"EWING C. BLAND, J."