Mary E. KESTNER, Plaintiff-Respondent,

and

Bailey Kestner, Plaintiff,

v.

Lucy Shepard JAKOBE, Defendant-Appellant.

No. 8855.

Springfield Court of Appeals.

Missouri.

Sept. 16, 1969.

Albert C. Lowes, Kenneth L. Waldron, Buerkle & Lowes, Jackson, for defendant-appellant.

C. H. Parsons, Jr., Dexter, for plaintiff-respondent.

HOGAN, Presiding Judge.

This is a second appeal. Plaintiff Mary Kestner sustained personal injuries when the automobile in which she was riding collided with another being driven by defend-

ant Lucy Jakobe. Plaintiffs sued both the host driver, a Mr. John Litzler, and Mrs. Jakobe, but dismissed as to defendant Litzler before trial. A jury found against plaintiff Bailey Kestner on his claim for medical expenses and loss of services, but found for Mrs. Kestner on her claim for personal injuries and awarded her the sum of $3,449.00 as damages.

Defendant Jakobe appealed. Among other things, she argued that the release which plaintiff Mary Kestner and her husband gave Mr. Litzler five days after the accident operated as a complete bar to this action. Plaintiffs admitted execution of the release but sought to avoid it as a bar on the ground that it was procured by fraudulent representation. Plaintiffs were prevented by the trial court from developing any issue concerning the validity of the release. Upon review of the record, this court held: (1) that on its face and upon the record presented, the release in question operated as a discharge of the whole cause of action, and not merely as a release of one joint tort-feasor; (2) that if the release had been procured by fraudulent representation, it was either void or voidable, depending on the nature of the fraud; (3) that plaintiffs were entitled to have the wrongful procurement of the release submitted to the jury along with all other issues in the case, a general verdict being rendered on all issues; (4) that since the trial court had, by an erroneous ruling, prevented a full development of the case on its merits, the cause should be reversed and remanded generally as to plaintiff Mary Kestner. We noted that plaintiff Bailey Kestner had not appealed, and ordered that the judgment against him be held in abeyance pending retrial. We further ordered that upon retrial the court enter a judgment compatible with a verdict returned on the issues, and determining the cause in favor of defendant Jakobe and against plaintiff Bailey Kestner. Kestner v. Jakobe, Mo.App., 412 S.W.2d 205.

On remand, the cause was transferred on change of venue, see State ex rel. Jakobe v. Billings, Mo., 421 S.W.2d 16, and was fully relitigated. The second trial was a trial to the court without the aid of a jury, as provided by Rule 73.01, V.A.M.R. [Section 510.-310, R.S.Mo. (1959)]. With one exception which we shall note further in the course of the opinion, the pleadings remained the same. Plaintiff Bailey Kestner died before the case came to trial a second time. Upon the suggestion of his death, his cause of action was dismissed, without any immediate objection by defendant Jakobe. No findings of fact were requested and none were made; the trial court made a general finding for plaintiff Mary Kestner and against defendant Lucy Jakobe, in the amount of $2,750.00. Defendant Jakobe has not appealed from the adjudication that she is liable, but she has meticulously briefed some six assignments of error dealing with the trial court's implied finding that the release did not discharge her from liability. The principal question for review is whether or not the plaintiff's evidence was sufficient to show that the release was procured by fraud. This necessitates at least a general review of the facts.

The accident occurred on Saturday, February 13, 1965. Mr. and Mrs. Kestner were passengers in Mr. Litzler's car, traveling south on Highway 25 near Malden, Missouri. Mrs. Jakobe was going north and she attempted to turn left in front of the Litzler vehicle in order to enter a private driveway on the west side of the road. The two vehicles collided. Mrs. Kestner sustained injuries when she struck her head on the rearview mirror.

On Tuesday, February 18, a lay adjuster representing Mr. Litzler's insurance carrier called on the Kestners. The adjuster, a Mr. Grimes, discussed the accident and, according to his testimony, the extent of the Kestners' injuries with them at that time. The release in question, which is set out in full in our earlier opinion, was then executed, and the plaintiffs were given a draft in the amount of $50.00.

Several different versions of the conversation between Mr. Grimes and the Kest-

ners were given. Mr. Litzler's testimony was that he had sat in the room with Mr. Grimes and the Kestners, and had heard all that was said. Mr. Litzler's recollection was that Mr. Grimes had asked some questions about the manner in which the accident occurred, and Mrs. Kestner mentioned that her glasses had been broken. Grimes asked to see the glasses and inquired how much they had cost. Mrs. Kestner was not sure, but as she recalled they had cost either $45.00 or $47.50. Mr. Grimes then made out a draft for $50.00 and filled in some additional documents for the Kestners' signatures. Litzler asked no questions about the effect of the release, but as Grimes put "the papers" in his briefcase and started out the door, he said, "I guess you know that releases you and they [the Kestners] can't sue you."

Mrs. Kestner, 52 years old at the time she signed the release, testified that she had only a third grade education. Mr. Grimes came to her house, she said, a "few days after the accident." Mr. Grimes "talked to us some," and she signed some papers while he was there. Mrs. Kestner did not know what she was signing, but she thought the payment "was only for the glasses." Mr. Grimes did not read the release to her, she did not look it over, and neither did Mr. Litzler. Mrs. Kestner believed Mr. Grimes when he said the payment was only for her glasses, but after she had signed the release, Mr. Grimes "turned around and said to me 'I guess you know you can't sue Mr. Litzler.' " Mrs. Kestner did testify that Mr. Grimes had said "it left five hundred dollars medical care open for a year."

Mrs. Kestner was shown the release. She identified her signature at the bottom of the page. She stated that she had not asked to have the release read, but had just " * * * taken his [Grimes'] honesty for it and his word." Being asked if she could read the words "Release of All Claims" across the top of the paper, she answered that she could see the letters but could not read them. Mrs. Kestner stated a number of times that she would

not have signed the release had she known it was a release.

Parts of a pretrial deposition given by Mrs. Kestner were put in evidence by defendant Jakobe. It is appropriate to set forth some of the questions and answers verbatim, particularly those concerning the execution of the release.

"Q. Did Mr. Grimes also tell you that Mr. Litzler had on his policy $500.00 or some such coverage to pay your medical bills that you incurred up to the amount of the policy for a period of one year?

A. After we signed the papers and all he said, 'This leaves the medical pay open and this releases Mr. Litzler,' and I believe also leaves $500.00 for medical bills.

Q. And that was all right with you at the time?

A. Yes, because I didn't know I was going to have these severe headaches and all, and I didn't—well, I actually didn't know anything about it.

Q. Do I understand you, Mrs. Kestner, you felt that you weren't hurt as severely as you now believe you're hurt?

A. That's right, I was having headaches and I thought maybe, naturally, the lick on my head—

Q. It would go away in a few days?

A. That's right, and I was sore and stiff, I was just sore and stove up all over, and I thought it would just be a matter of time, yes.

Q. Did Mr. Grimes tell you anything at all or did you discuss with Mr. Grimes anything at all about any other claim you might have?

A. No.

Q. You didn't discuss it?

A. He just went and got that and wrote out the check and brought in some papers and all and asked me to sign them, he

didn't read them and I didn't read them, and he didn't say anything. Of course, I couldn't have read it and understood it, there might have been some words on there I could have made out, but he didn't give us any understanding on what we were signing at all, other than for the glasses.

Q. In other words, you're saying, if I understand you, Mrs. Kestner, that nothing was said about Mrs. Jakobe, the other gal in the car?

A. No, no, that's right.

*    *    *    *    *    *

Q. One other question. Could you hear Mr. Grimes testifying this morning from where you sat, 10 or 15 feet across the room?

A. I could hear him, yes.

Q. Anything at all about his testimony that you say wasn't true?

A. When he said he told us it released Mr. Litzler before I signed the papers, that wasn't true."

*    *    *    *    *    *

The defendant also introduced a deposition given by Mr. Grimes. At the time the release was executed, Mr. Grimes was a lay claims adjuster, 25 years of age, who had been working at his job about six months. When he gave his deposition, Mr. Grimes testified that he considered his integrity was being questioned; consequently, his answers to counsel's relatively simple questions tended to be profuse and repetitive, a sort of attempt to "explain the whole thing" with every answer. In substance, Mr. Grimes testified that after the accident occurred, he discussed it with Mr. Litzler, and "* * * from what he [Litzler] told me I felt that primary liability—in fact, all liability would rest with the third party." Mr. Grimes was "naturally" interested in having Mr. Litzler released, since, as he

put it, "* * * that was my job at the time." In company with Mr. Litzler, Mr. Grimes called on the Kestners. Grimes doubted that the Kestners would be able to read and interpret a release, and explained to them that he "was there on behalf of Mr. Litzler." Mr. Grimes thought Mr. and Mrs. Kestner were aware that he was working for Mr. Litzler's carrier, though he did not tell them the name of the company for which he worked. Mr. Grimes emphasized that he was inexperienced at the time and did not realize the difference between a release and a covenant not to sue, and he stressed the fact that he was in no way concerned with Mrs. Jakobe's liability at the time. As we have indicated, Mr. Grimes repeated himself a number of times, but his recollection of the conversation he had with the Kestners when the release was executed is fairly summed up in his answer to the following question:

"Q. Now, Mr. Grimes, tell us as best you are able the circumstances of this release.

A. Okay. * * * Of course, naturally, I was interested in releasing Mr. Litzler, and told him so, although these people were guest passengers in his vehicle, they still have a legitimate claim against all parties, I suppose, in one of these endeavors, and I had been working for this company a short time, and wasn't completely familiar with all techniques involved, but yet I had been out in the field enough to be investigating and settling claims, so I talked with the Kestners, and also Mr. Litzler, and advised them that I would like to get Mr. Litzler released, if at all possible, and we settled on the sume [sic] of $50.00 on the basis or [sic] replacing her glasses. Now, I told the people at the time that so far as I was concerned all that I was doing was releasing—or getting a release from Mr. Litzler, because—of course, I realized later, after I had been with the company longer, probably what I should have done

was taken a covenant or a covenant not to sue, but I guess probably ignorance on my part at the time or lack of experience, I hadn't been with them long, and this was the first instance a dual claim had come up with me, but I went ahead and took the release, but I had no intention of releasing anybody other than Mr. Litzler. I hadn't at the time had contact with anybody other than them concerning the claim. Consequently, I did take the release, signed it as a witness to the release, and paid both Mr. and Mrs. Kestner $50.00, which so far as I was concerned was going to pay for her glasses at the time, and Mr. Kestner had indicated he wasn't injured. I also advised the people that this didn't—wasn't all of the compensation they could receive. I don't recall the exact amount of the medical pay that all of our insurance policies have, and Mr. Litzler did have a medical pay provision, and I advised these people any medical bill they should incur between the date of that accident and one year following, the money would still be available to them. With that I left them. I advised them to—if they did get any medical bills, to send them over to the Farm Bureau office here at Bloomfield and we'd take care of them."

■ Though there are certain fundamental principles which serve as guides, it is well settled that each case of this kind must be subjectively considered and decided on its peculiar facts. Heckenkamp v. Kennedy, 8 Cir., 267 F.2d 887, 891 [1]. The elements of actionable fraud have been variously stated, but in general they are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon. Heckenkamp v. Kennedy, supra, 267 F.2d at 891 [2]; Wood v. Robertson, Mo., 245 S.W.2d 80, 82 [2].

The party having the burden of proof is entitled to have the evidence considered in the light most favorable to him, but so viewed, his evidence must establish each of the essential elements of fraud or he cannot prevail. Bayer v. American Mutual Casualty Co., Mo., 359 S.W.2d 748, 752 [1–4]; Powers v. Shore, Mo., 248 S.W.2d 1, 5 [2–4]. In this case the execution of the release was admitted by the plaintiffs and they had the burden of proving its invalidity. Bogus v. Birenbaum, Mo., 375 S.W.2d 156, 160 [3].

■ Bearing in mind that the term "representation" includes deeds, acts or artifices calculated to mislead another, as well as words or positive assertions, Universal C. I. T. Credit Corporation v. Tatro, Mo. App., 416 S.W. 2d 696, 702 [4], we are hard put to find any act or suggestion, single or composite, directed to the release itself. Mrs. Kestner repeated over and over, again and again, that she thought "it" or "that" was "only for glasses" or "only for the glasses." Mrs. Kestner was asked on direct examination what happened when the release was executed, and she answered:

"A. Well, as he got up to leave he turned around and said to me, 'I guess you know you can't sue Mr. Litzler.'

Q. What had he told you prior to that time?

A. He told me that was only for the glasses.

Q. Did he ask you any questions about the accident?

A. Yes. He asked about the accident.

Q. Did he say anything about whether or not this would release anybody prior to your signing the papers?

A. No.

Q. Was there ever any mention made of a release at any time?

A. No, and not until after I signed for the glasses."

As our previous recital of the testimony shows, Mrs. Kestner's evidence on deposition was that "[h]e just went and got that and wrote out the check and brought in some papers and all and asked me to sign them, he didn't read them and I didn't read them, and he didn't say anything. Of course, I couldn't have read it and understood it, there might have been some words on there I could have made out, but he didn't give us any understanding on what we were signing at all, other than for the glasses." Mrs. Kestner answered negatively when she was asked if Grimes said anything at all about any other claim she might have, and she also stated that nothing was said about Mrs. Jakobe.

■ We can, of course, quote only a part of Mrs. Kestner's testimony, and we realize that unless a witness' testimony is self-contradictory it must be considered as an integrated whole, and neither a trial nor an appellate result should be made to depend on isolated statements nor bits and pieces of testimony taken out of context. Garrard v. State Dept. of Public Health and Welfare, Mo.App., 375 S.W.2d 582, 592–593 [25]; Hampton v. Raines, Mo. App., 334 S.W.2d 372, 377 [5]. Mrs. Kestner's testimony is not altogether consistent, but it is not inherently self-contradictory, either. Considered as a whole, her evidence was that Mr. Grimes made no representation whatever concerning the release itself; he simply talked for a while, then went to his car, brought back some papers, and asked her and her husband to sign them without explanation. To be sure, she thought the draft was only in payment for a new pair of glasses, but one is moved to ask: What did she think the release was? There is no evidence that Mrs. Kestner was told it was a receipt, as was, for example, true in Kavadas v. St. Louis

Southwestern Ry. Co., Mo.App., 263 S.W. 2d 736, nor does the *plaintiffs'* proof show a set of circumstances designed to produce a false impression as to the nature of the instrument they were being asked to sign, such as was present in Scott v. American Mfg. Co., Mo.App., 20 S.W.2d 592. In our view, the plaintiffs' evidence fails to establish that any false or fraudulent representation was made. Certainly the case is not comparable to Rau v. Robertson, Mo., 260 S.W. 751, in which the plaintiff had said she did not wish to sign a release, but was induced to execute one upon the pretense that the rules of the hospital in which she was confined required it before her hospital bill could be paid. Moreover, the release which Miss Rau signed was deliberately folded, she testified, to conceal its nature.

■ We bear in mind that ordinarily a party is entitled to the benefit of his adversary's evidence, except in those cases where the adversary's evidence runs counter to the party's theory of recovery, or where it contradicts the party's own testimony, or where the adversary's testimony sought to be used is based solely upon the truth of a fact which the party denies. Trower v. Missouri-Kansas-Texas R. Co., 347 Mo. 900, 909, 149 S.W.2d 792, 796 [4]; Meese v. Thompson, 344 Mo. 777, 782, 129 S.W.2d 847, 850 [1]. It is also true that if a witness' evidence on deposition contradicts his trial testimony, it is for the trier of fact to say which version of the facts was true. Moore v. Ready Mixed Concrete Company, Mo., 329 S.W.2d 14, 20 [3]. However, Mrs. Kestner's deposition from which we have quoted, does not contradict her trial testimony; she was simply more articulate during her examination on deposition than she was while testifying. Her deposition supplements, rather than contradicts, her trial testimony. Essentially, as we have said, Mrs. Kestner's recollection was that Mr. Grimes made no explanation of the release; he gave her a check and some papers to sign, did not read the release, and made no attempt to tell her

and her husband—"give us an understanding," as she put it—what it was they were being asked to sign. If it had been plaintiffs' evidence, either on deposition or at the trial, that Grimes had tried to explain the effect of the release—which she did not understand—then we might look to the defendant's proof to supplement the plaintiffs', but the plaintiffs may not rely on an explanation or representation which they say was not tendered; a party, as we have said, may not piece out from his adversary's testimony a case based on facts he denies are true. Trower v. Missouri-Kansas-Texas R. Co., supra, 347 Mo. at 909, 149 S.W.2d at 796 [4]; Mollman v. St. Louis Public Service Co., Mo.App., 192 S.W.2d 618, 621–622 [3, 4]; 32A C.J.S. Evidence § 1040(3), p. 778.

Be that as it may, we believe another of the essential elements of the plaintiffs' case is lacking. Even if we assume that in some way Mr. Grimes' reference to future medical payments and his reference to the draft itself as being payment only for Mrs. Kestner's glasses led the plaintiffs to believe that they were only signing a receipt or making a partial settlement, we find nothing in the record which excuses the plaintiffs from exercising at least a minimal amount of prudence in protecting their own interests. It was essential that plaintiffs establish element (8), the "right to rely" on any representation which was made. Our courts have consistently held that parties are not entitled to rely on representations of agents and others, absent some confidential relationship or fraudulent inducement tending to convince the releasor that he need not make an independent investigation of the facts. Heckenkamp v. Kennedy, supra, 267 F.2d at 892–893 [4]. To establish a "confidential relationship," there must be evidence of a special trust with respect to the property or business under consideration, even though the relations between the parties may be informal. Wilhoit v. Fite, Mo., 341 S.W.2d 806, 813 [5–6]. In plaintiffs'

brief, counsel refers to Mr. Litzler as plaintiffs' "long time friend and confidant," but proof of that relationship is lacking in the record. Mr. Litzler and Bailey Kestner had been friends for many years, but there is no evidence that the Kestners regarded Mr. Grimes as their "close friend's representative," or that the plaintiffs reposed any special confidence or trust in Mr. Grimes. Rather, the record indicates that the plaintiffs met Mr. Grimes for the first time on February 18, 1965; they had never seen him before, and he explained the nature of his adversary position to them. Plaintiffs cite Dawes v. Elliston, Mo.App., 369 S.W.2d 285, in support of their position, but this case does not have the element of duress which the court found to exist in the *Dawes* case, and we do not consider the *Dawes* case as persuasive authority that a confidential relationship existed between the Kestners and Mr. Grimes. The general rule, and the rule which we believe applies here, is that a party must exercise reasonable care in view of his situation to ascertain the truth before he can say he was misled, unless inquiry was prevented by the fraud-feasor, or unless the fraud-feasor has, or by artifice obtains, the confidence of his victim and anesthetizes his sense of caution. Heckenkamp v. Kennedy, supra, 267 F.2d at 891–892; Wood v. Robertson, supra, 245 S.W.2d at 84 [3–5]; State ex rel. Union Pac. R. Co. v. Bland, 324 Mo. 601, 610, 23 S.W.2d 1029, 1032–1033. The testimony of plaintiff Mary Kestner negates the existence of any inducement to refrain from inquiry as to the nature of the release, and as stated, the record is barren of any suggestion that plaintiffs reposed confidence in Mr. Grimes. And, contrary to assertions made in plaintiffs' reply, Mrs. Kestner testified that at the time she signed the release she was not in intense pain; she was "sore and stiff," but "thought it [her recovery] would just be a matter of time." True, Mrs. Kestner was only semi-literate, but she did not advise Mr. Grimes of that fact, and he only suspected it. In the circumstances, it was the plaintiffs' duty to have the instru-

ment read or explained to them by someone else on whom they had the right to rely. Poe v. Illinois Cent. R. Co., 339 Mo. 1025, 1037–1038, 99 S.W.2d 82, 89 [5–9]; Yerxa, Andrews & Thurston v. Viviano, Mo., 44 S.W.2d 98, 99 [1, 2]; Alford v. Wabash Ry. Co., 229 Mo.App. 102, 108, 73 S.W.2d 277, 280 [4]. In so ruling, we do not overlook Litzler's testimony that Grimes said the payment of $50.00 "had nothing to do with this lawsuit," and Mrs. Kestner's passing re-affirmation of that statement in her deposition. We simply do not regard Litzler's memory as very accurate, or his testimony very convincing, in view of the fact that he admitted, on cross examination, that this lawsuit had not been discussed at the time the release was executed, and in view of the fact that he was unable to recall the conversation accurately. In summary, and for the reasons stated, we believe the plaintiffs failed to prove that the release in question was procured by fraud in the respects enumerated.

The respondent urges, at least indirectly, that we should affirm the judgment on the ground of mutual mistake. She points out that before the second trial she attempted to amend her reply to plead a "contract" rescinding the release she had executed, but was not permitted to do so. She also calls our attention to the fact that after the release was executed Mr. Litzler's carrier paid plaintiffs an additional $399.00 and plaintiffs executed a covenant not to sue Mr. Litzler. These actions alone, the respondent says, indicate that Litzler's carrier was not satisfied with the circumstances and conditions under which it had obtained the release.

■■■ This court did state in its former opinion that an agreement of compromise can be modified or rescinded by the parties like any other contract, Kestner v. Jakobe, supra, 412 S.W.2d at 209, but upon reconsideration we find that statement too broad and ill-considered in context. So far as the respondent's attempted amendment of her reply is concerned, our remand was of

course a general remand, and amendments of the pleadings were permissible; however, the allowance of amendments was a matter in the sound discretion of the trial court. Adams v. Adams, 350 Mo. 152, 154–155, 165 S.W.2d 676, 677 [2] [3, 4]. The amendment was tendered only a few days before the second trial, and we find no abuse of discretion in denying respondent permission to amend her reply. As far as reviewing the case on some unpleaded theory is concerned, we decline. It is true that there are cases in which the pleadings can properly be regarded as having been amended by implied consent, Rule 55.54, V.A.M.R. [Section 509.500, R.S.Mo. (1959)], but it is a most elementary rule of appellate practice that a case should be reviewed upon the theory on which it was tried. Voelker v. St. Louis Mercantile Library Ass'n., Mo., 359 S.W.2d 689, 693 [2]; Hollman v. Lange, 143 Mo. 100, 108–109, 44 S.W. 752, 754 [3]; Herrick Motor Co. v. Fischer Oldsmobile Co., Mo.App., 421 S.W.2d 58, 63 [5]. There is no indication here that mutual mistake was recognized by the parties as an issue during the trial, and to review this case on the assumption that some amendment had been impliedly consented to would be patently unfair and prejudicial to the defendant.

■■■ A final point to be noticed is defendant Jakobe's claim that the trial court erred in failing to assess part of the costs against plaintiff Bailey Kestner. As we noted in our former opinion, plaintiff Bailey Kestner asserted a claim for medical expenses and loss of services. He was actually asserting a separate, distinct cause of action. Rea v. Feeback, Mo., 244 S.W.2d 1017, 1019 [2]. Mr. Kestner died before the second trial was had, and his cause of action abated. State ex rel. National Refining Co. v. Seehorn, 344 Mo. 547, 555–556, 127 S.W.2d 418, 423–424 [7] [8]. Therefore, while the court might and should have entered a judgment on the original verdict in the name of the original parties, it had no authority to assess any part of the costs against Bailey Kestner or his personal

representative, if any. In re Thomasson, Mo., 159 S.W.2d 626, 628 [2] [3, 4].

For the reasons indicated, we conclude that plaintiff Mary Kestner failed to establish that the release in question was procured by fraud. We are still persuaded, as we were on the first appeal, that the release constituted a discharge of the whole cause of action, though we did not and do not mean to say that the *form* of the release is determinative. New Amsterdam Casualty Co. v. O'Brien, Mo., 330 S.W.2d 859, 864–865; and see Bacon v. United States, D.C.Mo., 209 F.Supp. 811, 814–815 [2], aff'd., Bacon v. United States, 8 Cir., 321 F.2d 880. The judgment is therefore reversed, with directions to enter a judgment for defendant Jakobe and against both plaintiffs.

STONE and TITUS, JJ., concur.